IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARIUS INTERNATIONAL, INC.,  :   CIVIL ACTION
et al.                       :
                             :
        v.                   :
                             :
ROBERT O. YOUNG, et al.      :   NO. 05-6184

MEMORANDUM AND ORDER

McLaughlin, J.                          April 23, 2008

TABLE OF CONTENTS

PAGE

INTRODUCTION   . . . . . . . . . . . . . . . . . . . . . 6

I.  Findings of Fact . . . . . . . . . . . . . . . . . . 9

    A.  Dr. Young's Background. . . . . . . . . . . . . . 9

    B.  The Youngs' Original Companies. . . . . . . . . . 10

    C.  Innerlight International, Inc.. . . . . . . . . . 10

        (1)  Size and People. . . . . . . . . . . . . . 10

        (2)  Products.. . . . . . . . . . . . . . . . . 11

        (3)  Marketing. . . . . . . . . . . . . . . . . 11

        (4)  Problems.. . . . . . . . . . . . . . . . . 13

    D.  Initial Contact with Darius.. . . . . . . . . . . 14

    E.  Agreements. . . . . . . . . . . . . . . . . . . . 15

        (1)  Non-Competition Agreement ("NCA"). . . . . 15

        (2)  Asset Purchase Agreement ("APA").. . . . . 18

        (3)  Consulting Agreement ("CA"). . . . . . . . 24

        (4)  Post-Closing Agreement ("PCA").. . . . . . 28

    (5)   Doc Broc Royalty Agreement.. . . . . . . . .   30

    (6)   Oral Agreements. . . . . . . . . . . . .   31

F.   Innerlight.. . . . . . . . . . . . . . . . .   31

    (1)   Generally. . . . . . . . . . . . . . . .   31

    (2)   The Youngs' Involvement and Influence. . . . .   32

    (3)   Distributors.. . . . . . . . . . . . . .   34

        a.   Generally.. . . . . . . . . . . . .   34

        b.   Innerlight's Global Scope.. . . . . . .   35

        c.   Stephanie McAnly and Her Distributors... .   35

    (4)   Marketing. . . . . . . . . . . . . . .   36

    (5)   Increased Sales. . . . . . . . . . . . .   38

G.   The Youngs' Separate Activities.. . . . . . . .   39

    (1)   The Youngs' Website. . . . . . . . . . .   39

    (2)   Separate Businesses and Products.. . . . . .   40

H.   Problems. . . . . . . . . . . . . . . . . .   40

    (1)   Resale of Innerlight Products. . . . . . . .   40

    (2)   Attempted Renegotiations.. . . . . . . . .   45

    (3)   The pH Miracle Professional Line.. . . . . .   46

        a.   Generally.. . . . . . . . . . . . .   46

        b.   Specific Product Comparisons. . . . . . .   47

        c.   Sale of pH Miracle Products
            and Use of Trademarks.. . . . . . . .   53

        d.   Harm to Innerlight. . . . . . . . . .   58

        e.   The Defendants' Profits on Sales
            of pH Miracle Products. . . . . . . . .   64

2

(4)  New Products.. . . . . . . . . . . . . . .  66

    a.  Doc Broc. . . . . . . . . . . . . .  66

    b.  InLighten Everyday Shampoo,
        InLighten Everyday Conditioner,
        and InLighten BioTin Hair Tonic Spray.. .  67

    c.  Earth Essence Clay. . . . . . . . . .  68

    d.  SuperSoy Sprouts Powder.. . . . . . .  69

    e.  Aqua $O_2$ MSM and Aqua $O_2$ Selenium. . . . .  70

    f.  Stabilized Oxygen Topical Spray.. . . . .  71

    g.  HCA Plus, Core Cleanse, CLA Boost,
        and L-Carnitine.. . . . . . . . . . .  72

(5)  The Set-Offs.. . . . . . . . . . . . . .  73

    a.  Resale of Innerlight Products.. . . . . .  75

    b.  Prime pH. . . . . . . . . . . . . .  75

    c.  New Products. . . . . . . . . . . . .  78

(6)  The Ordway Transaction.. . . . . . . . . .  78

    a.  The Structure and Chronology of
        the Transaction.. . . . . . . . . . .  78

    b.  Sales by Doxey after the Transaction. . .  85

    c.  Damages.. . . . . . . . . . . . . .  90

(7)  The Youngs' Involvement with
     Innerlight Activities Dwindles.. . . . . . .  92

(8)  Innerlight's Use of the Youngs'
     Likenesses and Intellectual Property.. . . . .  94

(9)  The Equipment Leases.. . . . . . . . . . .  95

II.  Conclusions of Law.. . . . . . . . . . . . . .  96

    A.  Whether Innerlight's Set-Off Breached
        the Parties' Agreements.. . . . . . . . . .  97

3

B.   The Validity of the Non-Competition Agreement.. . . .  100

     (1)   Geographical Scope.. . . . . . . . . . . . . .  103

     (2)   Duration.. . . . . . . . . . . . . . . . . . .  105

     (3)   Types of Activities. . . . . . . . . . . . . .  108

     (4)   Hardship Imposed on the Youngs.. . . . . . . .  109

     (5)   The Public Interest. . . . . . . . . . . . . .  109

     (6)   Overall Reasonableness.. . . . . . . . . . . .  110

C.   Breach of Contract  . . . . . . . . . . . . . . . .  110

     (1)   Breach of the CA and NCA by
           Selling pH Miracle Products. . . . . . . . . .  111

           a.   Analysis of Relevant Contractual
                Provisions. . . . . . . . . . . . . . . .  112

           b.   Application of Analysis to Products.. . .  117

     (2)   Breach of the APA and PCA by Using the
           "Innerlight," "Alkalarian" and "Alkalize &
           Energize" Trademarks.. . . . . . . . . . . . .  120

D.   Lanham Act and Related State Law Claims.. . . . . .  122

     (1)   Unfair Competition.. . . . . . . . . . . . . .  122

     (2)   Trademark Infringement.. . . . . . . . . . . .  127

E.   The Plaintiffs' Other Claims. . . . . . . . . . . .  128

F.   The Defendants' Counterclaims.. . . . . . . . . . .  128

     (1)   Intentional Interference with Prospective
           Contractual Relations. . . . . . . . . . . . .  128

     (2)   The Youngs' Right to Terminate Innerlight's
           Right to Sell the New Products and to Use
           the Youngs' Other Intellectual Property. . . .  130

           a.   Products Other Than Doc Broc .. . . . . .  131

           b.   Doc Broc. . . . . . . . . . . . . . . . .  132

4

    c. Designs, Logos and Insignias. . . . . . . 133

    d. The Youngs' Likenesses. . . . . . . . . 133

  (3) The Equipment Leases.. . . . . . . . . . . 134

G. Damages.. . . . . . . . . . . . . . . . . . . 134

  (1) Damages for Violation of the Non-Competition
    Agreement. . . . . . . . . . . . . . . . . . 134

  (2) Lanham Act Damages.. . . . . . . . . . . . 139

    a. Actual and Treble Damages.. . . . . . . 139

    b. Attorneys' Fees.. . . . . . . . . . . . 144

H. Injunctive Relief.. . . . . . . . . . . . . . . 145

  (1) Contractual Relief.. . . . . . . . . . . . 145

  (2) Lanham Act Relief. . . . . . . . . . . . . 145

INTRODUCTION

This case involves a dispute in the nutritional and dietary supplement industry. The plaintiffs are corporations, Darius International Inc. ("Darius"), and Innerlight Inc. ("Innerlight").[1] The defendants are adult individuals, Dr. Robert O. Young and his wife, Shelley R. Young ("the Youngs"). In early 2001 and thereafter, the parties entered into various agreements (collectively, "the acquisition"), under which they formed a business relationship centering on the development, marketing, and selling of products related to the nutritional and dietary supplement industry. The plaintiffs purchased certain assets of the defendants' and the defendants' companies, and the defendants agreed to serve as consultants to the plaintiffs and not to compete in certain ways with the plaintiffs. In exchange, the plaintiffs agreed to pay the defendants certain monetary consideration, including ongoing monthly commissions.

The plaintiffs claim that the defendants have breached several of these agreements, breached their fiduciary duty, and engaged in trademark infringement, unfair competition, tortious

_____

[1] Until recently, Darius was a wholly-owned subsidiary of The Quigley Corporation ("Quigley Corp."). On or about February 29, 2008, Quigley Corp. sold Darius to Innerlight Holdings, Inc., whose major shareholder is Kevin Brogan, the president of Innerlight. Innerlight was formerly known as Darius Marketing Inc. ("Darius Marketing"), and is a wholly-owned subsidiary of Darius. Quigley Corp. Press Release attached to 3/11/08 Letter from Michael Onufrak.

interference, and appropriation of trade values.  These claims are largely based upon the defendants' launch and allegedly continuing sales of their pH Miracle Professional Line of nutritional and dietary supplement products.  Innerlight alleges that these sales violate the non-competition agreement among the parties and that the Youngs' failure to promote Innerlight products has caused Innerlight to lose additional profits.  Innerlight claims the right to set off certain of its contractual damages against the commissions it would otherwise owe the defendants.

The defendants argue that the parties' agreements are void and terminated because Innerlight breached them by failing to pay the Youngs the royalties due to them.  The defendants also argue that the non-competition agreement is unenforceable because it is unlimited in duration and works an unreasonable hardship on the Youngs.  They also bring counterclaims for intentional interference with prospective contractual relations; for a declaratory judgment that the Youngs have properly terminated oral licenses they gave to the plaintiffs for the sale of new products[2] and have properly terminated Innerlight's right to use

_____

[2]     These products are:  Aqua $O_2$ MSM, Aqua $O_2$ Selenium, BioGen, Topical Oxygen Spray (referred to elsewhere as Stabilized Oxygen Topical Spray), Doc Broc's Chewable Greens, Doc Broc's Chewable Vitamins, Earth Essence Redmond Clay (with and without peppermint), InLighten Everyday Shampoo, InLighten Everyday Conditioner, InLighten Advanced Formula Shampoo, InLighten Advanced Formula Conditioner, InLighten BioTin Hair Tonic Spray,

the defendants' other intellectual property; and that Innerlight must indemnify the Youngs for the cost of certain office equipment leases.

The plaintiffs moved for a preliminary injunction on December 8, 2005.  On April 20, 2006, the Court issued a Memorandum and Order ("the preliminary injunction opinion") granting the plaintiffs' motion on the claims of breach of contract and unfair competition, and granting it in part and denying it in part on the trademark infringement claim.  The Court otherwise denied the plaintiffs' motion.  The plaintiffs posted bond in the amount of $200,000.00 to secure against the wrongful entry of the preliminary injunction.

The defendants thereafter moved for dissolution or reconsideration of the preliminary injunction.  The motion was based upon the plaintiffs' invocation of a contractual set-off provision against the commissions the plaintiffs owed the defendants.  The Court denied that motion on June 13, 2006, but increased the plaintiffs' bond to $800,000.00.

The plaintiffs filed a Third Amended Complaint on August 30, 2006.  The defendants answered that complaint, with counterclaims, on September 28, 2006.  The Court held a bench trial on November 13, 2006, through November 15, 2006.

---

InLighten Advanced Formula Pack, and InLighten Skin Care Pack.
Ex. C to Def. Answer and Counterclaim to 3d Am. Compl.

The Court adopts many of the facts it found in the preliminary injunction opinion.  The parties and the Court agreed at the final pretrial conference that the testimony and evidence from the preliminary injunction hearing are part of the trial record, pursuant to Federal Rule of Civil Procedure 65.  The Court has reproduced here all findings of fact that it so adopts. The present opinion contains all of the Court's final findings of fact.  11/13/06 Trial Tr. at 5.

I.   Findings of Fact

A.   Dr. Young's Background

1.  Dr. Robert Young has various undergraduate, graduate, traditional and nontraditional degrees in science and nutrition, and has published several works in these areas.  Dr. Young's philosophy centers on the idea that there is only one sickness and one disease, and that it is caused by the over-acidification of the blood due to lifestyle and dietary choices. He calls his approach the "alkalarian" lifestyle.  Prelim. Inj. Hrg. Tr. ("P.I. Tr.") at 213-16, 219-21.

B.   <u>The Youngs' Original Companies</u>

2.   Around 1987 or 1988, Dr. Young and his wife
Shelley founded a company called Innerlight, Inc. in their home.[3]
The Youngs also formed Hikari Holdings, L.C. ("Hikari"), as a
limited liability corporation that holds their intellectual
property.  P.I. Tr. at 216, 220-21.

3.   The Youngs developed and sold health-related
products.  They did some limited marketing of their products
through fairs, trade shows, retreats, home and group meetings,
and publications.  P.I. Tr. at 216-17, 220.

C.   <u>Innerlight International, Inc.</u>

(1)  <u>Size and People</u>

4.   The original Innerlight, Inc. eventually became
Innerlight International, Inc. ("Innerlight International").  In
1999, Innerlight International had 20-25 employees.  Between
September of 1999 and December of 2000, the management team was
let go and Robert Kaelin ("Kaelin") started as the new President.
Kathy Christiansen ("Christiansen") was in Customer Service, and
was then promoted to Operations and given more supervisory

---

[3]   This company in its early form no longer exists, and is
distinct from the "Innerlight Inc." that is a plaintiff in this
case.  The original company's evolution into the current
"Innerlight Inc." is described below.

responsibilities over products and inventory.  P.I. Tr. at 17-19, 21-24.


    (2)  <u>Products</u>

    5.  Innerlight International sold various products related to nutrition.  In 1999, the two lead products of Innerlight International were SuperGreens and Prime pH, which are mixed together with water to form a drink.  These products are marketed as increasing the pH of one's water in order to alkalize the body and improve health.  Prior to 2001, Innerlight International also sold one book that Dr. Young had written, and one that his wife had written.  The Youngs held some seminars and operated the Robert O. Young Research Center, also known as the Innerlight Biological Research Center, in Alpine, Utah.  Dr. Young held new biology microscopy[4] courses.  Shelley Young held a cooking class.  P.I. Tr. at 20-21, 29, 223-25, 230.


    (3)  <u>Marketing</u>

    6.  Innerlight International's products were sold through two different channels.  First, they were sold through independent distributors under a multilevel marketing ("MLM") scheme.  MLM, also known as network marketing, involves using

---

    [4]  Microscopy involves taking blood from people and examining live blood under a microscope, with the aim of discovering the person's health problems.

independent distributors as salespeople for a product.  One distributor sells to another, who sells to another down the line, and so on.  When distributors sell products at retail cost, they earn the difference between that cost and wholesale cost.  They also receive commissions on the sales of any products bought for personal use or resale by distributors under them.  They can sell to anyone in the general public, including friends, relatives, co-workers, and people attracted through brochures and flyers.  A buyer of the product can, but is not required to, become a distributor himself.  P.I. Tr. at 24, 83, 108-09, 221.

7.   The second sales channel was Tony Robbins, a speaker who promoted Dr. Young and his products at his own events.  Robbins would make large orders from Innerlight International, causing an influx in sales.  P.I. Tr. at 24, 26, 28.

8.   Innerlight International used various marketing tools.  There was one tape that featured Tony Robbins and Dr. Young.  There were no promotional book tours, DVDs, or CDs. There was one convention that was scheduled and then cancelled, and one that took place in Salt Lake City in 2000 that had approximately 25 to 30 distributors and 50 people total in attendance.  There was a newsletter, and there were conference

calls.  In addition, individual distributors scheduled their own events.  P.I. Tr. at 29, 64-66, 177; Def. Ex. 38.[5]

    (4)   <u>Problems</u>

    9.   At some point, Robbins developed his own line of products.  In addition, he attempted to purchase Innerlight International, but the attempt failed.  At that point, Robbins stopped purchasing Innerlight International's products.  Although Innerlight International sales had peaked at $300,000 per month, by late 2000, monthly sales had dropped to $250,000, and were headed lower.  The company was in financial trouble and anticipated being unable to meet its payroll and sales tax obligations.  The number of distributors in the company's network had waned by January of 2001.  At some point, the Youngs decided that they did not want to focus on the marketing aspect of the business, so they looked into selling the company.  P.I. Tr. at 21-28, 158, 221.

---

    [5]   The parties have consecutively numbered their exhibits to include their preliminary injunction exhibits.  Thus, defendants' exhibits 1-61 and plaintiffs' exhibits 1-32 were also part of the preliminary injunction record.

D.   Initial Contact with Darius

10.   Through Russ and Maryann Green, Innerlight International distributors, the Youngs met Ron Howell ("Howell"). Dr. Young eventually learned that Howell was the President of Darius Marketing,[6] and that Darius was looking to purchase MLM companies.  Negotiations commenced between the Youngs and Darius. P.I. Tr. at 225-26.

11.   Howell was given carte blanche on the Darius side of the negotiations, although he needed final approval from Quigley Corp.'s general counsel.  P.I. Tr. at 356-57; Howell Dep. at 22-23.

12.   Innerlight International's President and CEO, Kaelin, conducted some of the negotiations on behalf of the Youngs, because the Youngs were in Hawaii.  Dr. Young had direct and indirect conversations with Howell, and the Youngs retained decision-making authority.  Dr. Young got more involved in the later part of the negotiations.  P.I. Tr. at 226; Kaelin Dep. at 22; 11/14/06 Trial Tr. at 90-91.

---

[6]   Howell was fired in January of 2002, and was involved in litigation with Darius.

E.   <u>Agreements</u>

(1)   <u>Non-Competition Agreement ("NCA")</u>

13.   On January 2, 2001, Darius Marketing and the Youngs entered into a Non-Competition Agreement ("NCA").  The NCA contains a paragraph introducing the parties, an Explanatory Statement, and ten main headings labeled as follows:  (1) Non-Competition and Confidentiality Covenants; (2) Compensation; (3) Representations and Warranties Respecting Quigley Stock; (4) Prior Restriction; (5) Assignment; (6) Default; (7) Severability and Reformation; (8) Notices; (9) Waiver of Jury Trial; and (10) Miscellaneous.  Pl. Ex. 33, tab 10.

14.   The "Explanatory Statement" at the beginning of the NCA states that Darius Marketing purchased the business and certain assets of Hikari and Innerlight International.  It contains the following language:

> For many years, the [Youngs] have been key
> employees and principal owners of [Hikari and
> Innerlight International], and possess
> valuable knowledge, expertise and experience
> in the business of developing, marketing and
> selling nutritional supplements and related
> products (the "Products" which were purchased
> by [Darius Marketing], are set forth on
> Exhibit A to the Acquisition Agreement, and
> are distributed for sale through independent
> representatives nationally and
> internationally (collectively, the
> "Business").[7]  The Company desires to insure

---

[7]   As the Court noted in the preliminary injunction opinion, this sentence lacks a parentheses close.  <u>Darius Int'l v. Young</u>, No. 05-6184, 2006 WL 1071655, at *4 n.6 (E.D. Pa. Apr.

> [sic] that the [Youngs] do not compete with
> the Company, and its affiliates, except as
> expressly permitted hereby.

Pl. Ex. 33, tab 10.

15.  Section 1.1.1 of the NCA mandates, among other

things, that as long as Darius Marketing pays the Youngs a

monthly payment pursuant to the terms of a separate agreement,

the Youngs cannot without express written consent:

> Directly or indirectly, anywhere in the
> world, as a principal, partner, shareholder,
> agent, director, employee, consultant, or in
> any other capacity whatsoever engage,
> participate, invest of [sic] become
> interested in, affiliated or connected with,
> render services to, or, in exchange for any
> compensation or remuneration, direct or
> indirect, furnish any aid, assistance or
> advice to any person, corporation, firm or
> other organization engaged in, a business
> that is competitive with the Business that is
> conducted by the Company, or by any
> Affiliate, as defined in Section 1.4, as of
> the date hereof or to be conducted by the
> Company, or by any Affiliate, immediately
> after the date hereof with the assets
> acquired pursuant to the Acquisition
> Agreement.

Pl. Ex. 33, tab 10.

16.  In addition, § 1.1.2 prohibits the Youngs from

employing, "directly or indirectly, as a principal, partner,

shareholder, agent, director, employee, consultant, or in any

other capacity whatsoever" a person who was an Innerlight

employee within the previous twelve months.  Pl. Ex. 33, tab 10.

_____

20, 2006).

17.   Section (1) also prohibits the Youngs from disseminating Darius Marketing's confidential information.  It requires the Youngs to return materials relating to Darius Marketing's business at the end of the agreement.  It states that the parties agree that the NCA is reasonable.  Pl. Ex. 33, tab 10.

18.   Section (2) of the NCA describes the consideration that the Youngs received in exchange for their covenant not to compete.  The Youngs received 50,000 shares of Common Stock in Quigley Corp.  There are limits on the transferability of this stock.  Section (3) sets forth representations and warranties related to the stock, which focus on the fact that the stock was not registered under the Securities Act of 1933, as amended.  Pl. Ex. 33, tab 10.

19.   In section (4), the Youngs represent that they are not breaching any other agreement by signing the NCA.  Pl. Ex. 33, tab 10.

20.   Section (5) prohibits the Youngs from assigning their rights to others.  Pl. Ex. 33, tab 10.

21.   Section (6) states that if one of the Youngs materially violates the NCA, Darius Marketing has the right to set off damages against Quigley Stock in Darius Marketing's possession.  It allows Darius Marketing to seek injunctive relief in the event of a material violation by the Youngs.  It describes

17

the permissible methods of satisfaction of indemnity obligations. Pl. Ex. 33, tab 10.

22.   Section (7) contains a severability and reformation clause.  Section (8) sets forth the notice requirements under the NCA.  Section (9) contains a waiver of jury trial by the parties.  Section (10) requires written amendment, contains an integration clause, notes that the NCA shall be governed by Pennsylvania law, and gives Darius Marketing's affiliates the independent right to enforce the agreement against the Youngs.  Pl. Ex. 33, tab 10.

23.   The integration clause, which appears in § 10.2, states that the NCA, together with the Acquisition Agreement, constitutes the parties' entire understanding.  Pl. Ex. 33, tab 10.

(2)   <u>Asset Purchase Agreement ("APA")</u>

24.   On January 15, 2001, Innerlight International, Hikari, the Youngs, Darius Marketing and Darius entered into an Asset Purchase Agreement ("APA").  The APA contains a paragraph introducing the parties, four "whereas" clauses, and six[8] Articles, with the following headings:  (1) Purchase of Assets; (2) Representations and Warranties of [Hikari and Innerlight International] and the Youngs; (3) Representations and Warranties

---

[8]   Article 5 was "intentionally omitted" by the parties.

of [Darius Marketing] and Darius; (4) Closing Conditions; (6)

Post-Closing Agreements; and (7) Miscellaneous.  Pl. Ex. 33, tab

1.

25.    The first "whereas" clause states that the
sellers

> are the owners of certain trademarks,
> copyrights, formulations, and other
> proprietary information relating to
> nutrition, dietary supplements and related
> products (the "Products"), which Products are
> listed on [the] product list attached hereto
> as Exhibit A, together with any current or
> future modifications to the Products.
> [Innerlight International] owns and
> distributes items for sale, including but not
> limited to distributor kits and related
> assets, as well as the Products, through
> independent representatives nationally and
> internationally (collectively, the
> "Business").

Pl. Ex. 33, tab 1.

26.  Section 1.01 sets out the closing date of January

15, 2001.  Pl. Ex. 33, tab 1.

27.  Section 1.02 sets out the assets purchased and

sold, excluded assets, the purchase price, including adjustment

to it and allocation of it, and the closing documents.  Darius

Marketing purchased the trademarks, copyrights, formulations, and

other proprietary information related to Innerlight

International's nutritional and dietary supplements and related

products, together with any current or future modifications to

the products.  Darius Marketing purchased Innerlight

19

International, including its corporate name, inventory, customer lists, rights to modifications of products, equipment, cash, and records.  Darius Marketing may use and edit the tapes, videotapes and books that are in that inventory, as listed on Schedule 1.02(b)(ii), as long as Darius Marketing properly attributes ownership to the Youngs.  Pl. Ex. 33, tabs 1, 12.

28.  Section 1.02 grants to Darius Marketing "[t]he trademark 'Innerlight' and any designs or logos related thereto . . . together with all registered and unregistered names, marks, domain names, insignias, designs or logos related to any of the Products (the 'Trademarks'), all as listed on Schedule 1.02(b)(i)."  Pl. Ex. 33, tab 1.

29.  Schedule 1.02(b)(i) lists Innerlight, Liquid Lightning, SuperGreens, Prime pH, Myco Detox, Speed of Light, and Alkalize & Energize.  Pl. Ex. 33, tab 11.

30.  Section 1.03 states that the purchased assets shall not include the seller's assets that are listed in Schedule 1.03 (the "Excluded Assets").  If Darius Marketing "uses, but does not purchase, any or all of the Excluded Assets," then Darius Marketing shall pay the sellers the amount of the lease for the period of time that Darius Marketing uses the assets.  Schedule 1.03 includes, among other excluded accounts payable, "all leases from the following companies or assignees included

20

[sic] but not limited to" Colonial software.  Pl. Ex. 33, tabs 1, 14; 11/14/06 Trial Tr. 26-28.

31.  Section 1.08 grants Darius Marketing the right to use the name "Innerlight International, Inc.," and prohibits the Youngs from making further use of that name or a derivative or combination of it.  Pl. Ex. 33, tab 1.

32.  Section 1.09 allows the Youngs, at their sole option, to grant to Darius Marketing the right to obtain some or all of the Youngs' right, title, or interest in any new products developed by the Youngs at a mutually agreed-upon price and upon mutually acceptable terms.  Pl. Ex. 33, tab 1.

33.  Under § 1.10, the Youngs (and various people and companies associated with them) were permitted to purchase "any and all Products" from Darius Marketing at the Darius Marketing employee discount rate, which was subject to change, but which was approximately 7.5 times smaller than the wholesale rate, and 10 times smaller than the retail rate.  Section 1.10 states that "[a]ny and all purchases made pursuant to this Section 1.10 shall not be resold to [Darius Marketing's] distributors and customers, or used to compete with [Darius Marketing]."  Pl. Ex. 33, tab 1; P.I. Tr. at 17, 396.

34.  Section 1.11 grants Darius Marketing and Darius a license to the product formulations of the products that they purchased.  Upon full payment of amounts due under the APA, the

21

license would convert to irrevocable title.  The plaintiffs were required to keep the formulations confidential.  Even if the plaintiffs lost the license under it, they would still be allowed to continue "engaging in the Business, including a non-exclusive right to market, distribute and sell the Products."  Pl. Ex. 33, tab 1.

35.  Article (2) contains representations of the Youngs dealing with the organization and status of Innerlight International and Hikari, the authority of the parties relative to the agreement, a statement that the contract does not violate any prior agreements, financial statements, accounts receivable, the absence of undisclosed liabilities, the absence of material adverse change since the Balance Sheet Date, inventories, the absence of various developments, good title to purchased assets, tax matters, contracts and commitments, pending litigation, brokerage, compliance with laws, employees, regulatory and licensure matters, business records, transactions with certain persons, the absence of certain business practices, intellectual property, material misstatements or omissions, and the effective date of warranties, representations and covenants.  Pl. Ex. 33, tab 1.

36.  In § 2.11, each of the sellers warranted that it owned "good and marketable title, free and clear of all liens and

encumbrances, to its respective Purchased Assets," with certain exceptions not relevant here.  Pl. Ex. 33, tab 1.

37.  In § 2.23, the Youngs warranted that all of the trademarks that they owned were valid, registered, and in full force, and that all proper filings had been made and fees had been paid.  Pl. Ex. 33, tab 1.

38.  Article (3) contains representations of Darius and Darius Marketing dealing with organization, authority relative to agreement, a statement that the contract does not violate any prior agreements, litigation, and brokerage.  Pl. Ex. 33, tab 1.

39.  Article (4) deals with closing conditions including deliveries, due diligence results, the absence of any injunction against the consummation of the transaction, the opportunity of the employees of the sellers to be employed by the purchaser, the suppliers of the sellers, and the maintenance of relationships with suppliers, customers, independent representatives, and key employees.  Pl. Ex. 33, tab 1.

40.  Article (6) deals with post-closing agreements regarding indemnification by the Youngs, further assurances, non-competition within two years of the agreement, management information and accounting systems, and the preparation and filing of tax returns.  Pl. Ex. 33, tab 1.

41.  Article (7) deals with survival, termination, expenses, amendments and waivers, notices, assignment,

23

severability, integration, third-party beneficiaries, the use of gender and the singular and plural in the agreement, governing law, the meaning of "knowledge" in the agreement, counterparts, waiver of jury trial, and sales taxes.  Pl. Ex. 33, tab 1.

42.  Section 7.02(g)[9] allows the Youngs to terminate if Darius or Darius Marketing materially breached the APA.  Pl. Ex. 33, tab 1.

43.  Exhibit A to the APA lists approximately 180 products, including numerous nutritional supplements and accompanying brochures, books, tapes, and other sales aids.  Pl. Ex. 33, tab 2.

### (3)  Consulting Agreement ("CA")

44.  Also on January 15, 2001, Darius Marketing and the Youngs entered into a Consulting Agreement ("CA").  The CA contains a paragraph introducing the parties, an Explanatory Statement, and ten main sections labeled (1) Consulting Services; (2) Non-Competition and Confidentiality Covenants; (3) Compensation; (4) Prior Restriction; (5) Assignment; (6) Default; (7) Severability and Reformation; (8) Notices; (9) Waiver of Jury Trial; and (10) Miscellaneous.  Pl. Ex. 33, tab 9.

---

[9]    This section is labeled (e) in the APA, but it appears after section (f), so the Court will refer to it as section (g).

24

45.   The Explanatory Statement contains a slightly

different definition of the "Business" from the NCA:

> For many years, the [Youngs] have been key
> employees and principal owners of [Hikari and
> Innerlight International], and possess
> valuable knowledge, expertise and experience
> in the business of developing, marketing and
> selling nutritional supplements, dietary
> supplements and related products (the
> "Products" as defined below in Section 3.3);
> such Products are distributed for sale
> through independent representatives
> nationally and internationally (collectively,
> the "Business"). . . . The Company further
> desires to insure [sic] that the [Youngs] do
> not compete with the Company, and its
> affiliates, except as expressly permitted
> hereby.

Pl. Ex. 33, tab 9.

46.   Section (1) of the CA describes the consulting

services that the Youngs agreed to perform for Darius Marketing.

It requires them to be available for ten hours per month, and at

ten events per year, to advise, counsel and inform Darius

Marketing employees about the business.  It states that the

Youngs will be independent representatives of Darius Marketing

and will assist and advise Darius Marketing in developing new

representatives, products and services implementing Darius

Marketing programs.  It explains how the Youngs could be

terminated by Darius Marketing.  Pl. Ex. 33, tab 9.

47.   Section (2) describes the non-competition and

confidentiality covenants made by the Youngs.  The covenants are

similar to those in the NCA.  In particular, § 2.1.1 of the CA,

which describes what sort of competition is prohibited, is identical to § 1.1.1 of the NCA.  Unlike the NCA, the non-competition provision in § 2.1 of the CA specifically notes that the monthly payment that it is subject to can be reduced under a set-off provision.  Pl. Ex. 33, tab 9.

48.  Section (3) describes the compensation that the Youngs were paid under the CA.  Fifty percent of the compensation was for consulting services, and 50% was in consideration of the restrictive covenants.  The Youngs were paid as follows:  (1) they received 12% of Adjusted Gross Revenues if Adjusted Gross Revenues for the month preceding the payment date were equal to or greater than $250,000; (2) they received 10% of Adjusted Gross Revenues if Adjusted Gross Revenues for the month preceding the payment date were less than $250,000; and (3) they received 5% of Adjusted Gross Revenues after payments to them aggregated to the "Minimum Payment" of $540,000.  Adjusted Gross Revenues are revenues attributable to sales of the products purchased by Darius Marketing from the Youngs, adjusted for returns, allowances and discounts.  There were separate compensation provisions made in case revenues fell below a certain amount after January 1, 2003, and Darius Marketing agreed to let the Youngs market the products under a private label if Darius Marketing terminated the CA.  The payments were subject to reduction, and Darius guaranteed the payments under the CA.

Darius Marketing would reimburse the Youngs for expenses incurred in connection with their duties on behalf of Darius Marketing and pre-approved by Darius Marketing.  Pl. Ex. 33, tab 9.

49.  Section 3.3 of the CA defines the term "Product" as "those nutrition, dietary supplements and related products . . . which were purchased by [Darius Marketing] from the [Youngs] and are listed on Exhibit A to the Acquisition Agreement."  Pl. Ex. 33, tab 9.

50.  In section (4) of the CA, the Youngs represented that they were able to perform the CA without breaching other agreements.  Section (5) states that the Youngs may not assign their rights under the CA.  Pl. Ex. 33, tab 9.

51.  Section (6) governs the situation in which either of the Youngs commits a material violation of the agreement.  It states that in the event of such default, Darius Marketing may set off actual and reasonable damages incurred by it against payments otherwise due to the Youngs under the agreement.  It expressly allows Darius Marketing to seek injunctive relief if it determines in good faith that the Youngs have breached their non-compete.  Pl. Ex. 33, tab 9.

52.  Section (7) deals with severability and reformation.  Section (8) sets out notice requirements.  Section (9) contains a jury trial waiver.  Section (10) deals with

amendment, integration and third-party beneficiaries, and states that Pennsylvania law shall govern.  Pl. Ex. 33, tab 9.

53.  The integration clause, which appears in § 10.2, states that the NCA, together with the Acquisition Agreement, constitutes the parties' entire understanding.  Pl. Ex. 33, tab 9.

### (4)   Post-Closing Agreement ("PCA")

54.  On January 16, 2001, Innerlight International, Hikari, the Youngs, Darius Marketing, and Darius entered into a Post-Closing Agreement ("PCA").  The PCA contains a paragraph introducing the parties, two "whereas" clauses, and two main sections labeled (1) Amendments and Waivers and (2) Amendment. The "whereas" clauses note that the parties made the APA and wish to amend it and certain other documents.  Pl. Ex. 33, tab 29.

55.  Section 1.1 of the PCA amends the APA by deleting § 1.11 and replacing it with a new § 1.11.  The new section changes some of the terms of the agreement regarding the license for formulas, and divides the section into two parts.  Pl. Ex. 33, tab 29.

56.  Section 1.2 of the PCA adds "Alkalarian" to the list of trademarks purchased by Darius Marketing in the APA.  It states that Darius Marketing grants to the Youngs the non-exclusive right to use the marks "Alkalarian" and "Alkalize &

28

Energize" for "purposes of books, publications, and video and audio tapes, provided that use of the Marks shall, in all cases, be subject to the terms of any restrictive covenants now or hereafter in effect between [Darius Marketing] and [Innerlight International] and the Youngs."  Pl. Ex. 33, tab 29.

57.  Section 1.3 states that the purchase price adjustment in the APA shall not include increases attributable to a website or certain pictures or office supplies.  Pl. Ex. 33, tab 29.

58.  Section 1.4 states that the parties agree to waive the condition that the Youngs obtain the consents to assignment of lease from various Innerlight International landlords prior to closing, as long as they do so as soon as possible.  Pl. Ex. 33, tab 29.

59.  Section 1.5 limits the tax liabilities assumed by the Youngs.  Pl. Ex. 33, tab 29.

60.  Section 1.6 replaces Schedule 2.23 of the APA with a new Schedule 2.23.  This section contains a redefinition of the term "intellectual property" in the APA to reflect the new terms of the PCA.  Pl. Ex. 33, tab 29.

61.  Section 1.7 deletes § 3.1 of the CA and replaces it with a new § 3.1.  The new § 3.1 states that all payments to the Youngs are for consulting services, as opposed to being 50%

for consulting services and 50% for the non-compete.  Pl. Ex. 33, tab 29.

62.   Section 2 states that the PCA is intended to modify the APA and related documents, and that it controls in the case of a conflict between the PCA and the other agreements, but the latter otherwise remain in effect.  Pl. Ex. 33, tab 29.

(5)   Doc Broc Royalty Agreement

63.   Sometime after the acquisition, Dr. Young developed a chewable vitamin product called "Doc Broc."  It is a nutritional or dietary supplement and was not included on Exhibit A to the APA.  Doc Broc is also the name of a character depicted on the vitamins' label.  The parties entered into a royalty agreement on August 31, 2002, with an effective date of October 1, 2001.  The agreement has a term of three years from the effective date.  Thereafter, that term will renew for periods of one year unless one of the parties gives written notice of intent to discontinue the agreement 30 days before the expiration of the agreement.  Def. Ex. 130A;[10] 11/14/06 Trial Tr. at 113-15.

64.   The agreement provides for a royalty of 8% for sales of Doc Broc vitamins, and a royalty of 8% through March 31,

_____

[10]   There are two exhibits that are labeled defendants' exhibit 130:  the Doc Broc Royalty Agreement, and a letter of September 14, 2005, from Richard L. Hill to Tom MacAniff.  The Court will refer to the former as "Def. Ex. 130A" and the latter as "Def. Ex. 130B."

2002, and thereafter 15%, for sales of non-vitamin items, such as books and t-shirts, featuring Doc Broc.  The agreement grants a "nonexclusive, revocable, nontransferable, worldwide license under which [the plaintiffs] may sell and/or distribute the Doc Broc Materials."  The Youngs have the right to revoke the license at any time if the plaintiffs fail to pay any royalty due under the agreement.  Def. Ex. 130A ¶¶ 4, 8; 11/14/06 Trial Tr. at 113-15.

65.  McAnly signed the agreement on behalf of Innerlight and Darius International.  Def. Ex. 130A.


(6)  Oral Agreements

66.  After these agreements, various other oral agreements were made between the Youngs and Darius Marketing, Darius, and/or Quigley Corp.  For example, Innerlight agreed to pay Dr. Young royalties on a shampoo, a conditioner, a hair tonic, and a clay product, as described more fully below in the section on new products.  11/14/06 Trial Tr. at 52-56, 59, 116.


F.  Innerlight

(1)  Generally

67.  As per the agreements, Darius Marketing became Innerlight.  Innerlight remained similar to Innerlight International in many ways.  Although Kaelin left the company on

the day the APA was signed, Christiansen and other employees from
Innerlight International stayed on through the acquisition.
Kevin Brogan ("Brogan") was a distributor before the acquisition
and became the head distributor after the acquisition.  Before
and after the acquisition, the company operated out of Utah, and
through MLM.  P.I. Tr. at 59, 61, 157, 159; Kaelin Dep. at 30.

### (2)   The Youngs' Involvement and Influence

68.  Although Innerlight was now owned by Darius, Dr.
Young remained heavily involved with the company.  Innerlight
sold products created by him, and associated his science and
philosophy with those products through sales aids, conventions,
and other means of marketing.  Dr. Young was one of the "key"
people in selling Innerlight products, in part because he was the
person who could explain the technical and scientific theory
behind Innerlight's products.  Innerlight's products were
marketed as Dr. Young's products.  He would examine them to
ensure that their taste and look were satisfactory.  Pl. Ex. 33,
tab 9; P.I. Tr. at 30-31, 33-34, 41, 43-44, 49, 96, 101-02, 105,
316.

69.  Dr. Young could influence Innerlight sales.  At
some point, Dr. Young told people that it would be harmful to use
Innerlight's Sassoon line of products.  As a result, Innerlight
lost virtually all sales in that line, and essentially stopped

marketing it.  The same thing occurred with the Startan line of products.  P.I. Tr. at 179, 190-91, 423, 426.

70.  Innerlight invested substantial amounts of time and money in developing the association between the Innerlight product line and the Youngs.  During the time Innerlight and the Youngs were working closely together, there was a substantial increase in Innerlight's sales.  The Youngs are associated in consumers' minds with Innerlight products.  11/14/06 Trial Tr. at 35-38, 70-71; 11/13/06 Trial Tr. at 216; 11/14/06 Trial Tr. at 40; 11/15/06 Trial Tr. at 35-36.

71.  Shelley Young focused more on the lifestyle associated with the Innerlight products than the science.  She focused on designing meals and foods to integrate the products into people's diets.  P.I. Tr. at 163.

72.  Under section (3) of the CA, the Youngs (or their company, Hikari) received monthly payments from Innerlight totaling $3,565,512 between March of 2001 and December of 2005. They were paid $65,288.98 for January of 2006 and were paid again in February of 2006.  Pl. Exs. 3, 5; P.I. Tr. at 47, 55-56; Def. Sur-Repl. Br. Ex. G.

(3)   <u>Distributors</u>

　　a.   <u>Generally</u>

73.   Innerlight markets its products through MLM, and consequently, through its independent distributors.  Becoming an Innerlight distributor involves filling out an application, paying a $15 business-building kit fee, and receiving various supplies and information as required by law.  P.I. Tr. at 108-12.

74.   Often, the distributors are not professional salespeople, but are people looking for supplemental income. They need a duplicable and unique product that sells itself, and that is not available elsewhere.  P.I. Tr. at 89-90.

75.   At the time of the preliminary injunction hearing, there were approximately 170,000 Innerlight distributors, although only approximately 1,000-1,200 actually received weekly income from Innerlight.  Most of those who received weekly income depended upon that income for their livelihood.  P.I. Tr. at 100, 174.

76.   If distributors decide to stop doing business, they generally do not contact the company; rather, they simply stop buying and selling products.  P.I. Tr. at 117.

77.   Innerlight distributors are informed that they do not need to be experts on the science of Innerlight products because they can simply give their customers CDs on which Dr. Young explains his products.  They can also participate in weekly

34

conference calls on which they can learn about the products and other aspects of the business.  P.I. Tr. at 45.

### b.   Innerlight's Global Scope

78.  Innerlight has distributors in 26 countries and sales in 45 countries.  Its current president, Brogan, has traveled to Budapest and Taiwan to promote Innerlight's business. International sales made up about 20% of the company's revenues in 2005 and 35% to 36% of its revenues from January through October of 2006.  11/14/06 Trial Tr. at 65-68, 70-71.

79.  Dr. Young's books have been translated into Finnish, Danish, German, Greek, and other languages.  11/13/06 Trial Tr. at 40-41.

### c.   Stephanie McAnly and Her Distributors

80.  Stephanie McAnly ("McAnly") played a crucial role in marketing and selling Innerlight products.  P.I. Tr. at 94-102.

81.  She began working in MLM in 1995, and studied it in detail thereafter.  She worked with several different MLM companies before coming to Innerlight.  She would take distributors with her from one company to another.  At one point, McAnly helped set up the Sassoon Company and was its President. P.I. Tr. at 82-85.

35

82.   In late 2000, the Sassoon Company was looking to leave the MLM arena, and McAnly and her distributor network needed a new company.  Through contacts in the industry, McAnly learned of Darius and Innerlight.  McAnly was impressed with Dr. Young and his products, and felt that he needed better marketing methods.  In March of 2001, McAnly joined Innerlight as Executive Director and second in command, and Innerlight acquired McAnly's distributor network.  P.I. Tr. at 85-88.

(4)  <u>Marketing</u>

83.   Marketing efforts increased after the acquisition. McAnly's distributors signed up for automatic product shipments ("autoships") and began marketing the Innerlight products and sales plan.  McAnly changed the marketing strategy so that initially, distributors would market only the Innerlight products.  They would introduce the lifestyle, which is more difficult to follow, later on.  McAnly installed a voice-activated phone system and a fax on demand system that gave callers an overview of Dr. Young's philosophy.  She took Dr. Young's "bible," a thick booklet explaining his theories, and condensed it into a seven- or eight-page brochure.  She also did an interview with Dr. Young and Innerlight's top distributor, Brogan, and put it on a CD.  The CD's function was to put a spin on Dr. Young's products to set them apart from other greens

36

products in the market.  She put these materials, together with
Dr. Young's first book, in a business kit that was given to all
distributors.  P.I. Tr. at 35, 91-95, 97-99, 165-67.

84.  After the acquisition, there were several
conventions to promote Innerlight products.  Each year, there was
one international convention, one national convention, and two to
six regional conventions.  Attendance at these conventions
reached approximately 700 people.  At these events, Dr. Young
would speak about the benefits of his products and the lifestyle
he promoted.  Chad Czerneski ("Czerneski"), a full-time
Innerlight distributor, National Director, and Advisory Board
member, would give testimony while Dr. Young was onstage about
how SuperGreens and Prime pH had cured his cancer and sterility,
which he still sincerely believes.  Shelley Young would also
often speak.  New products, lead sellers, and sales aids, such as
CDs and brochures promoting Innerlight's philosophies, would be
sold after Dr. Young spoke.  At the conventions, the Youngs were
permitted to sell some of their own products, such as an exercise
trampoline, tapes, CDs, and a medallion.  The events were not
held unless Dr. Young was present, and he was a big draw to them.
Innerlight employees such as Christiansen eventually had to
escort Dr. Young into the conventions, lest he get stuck in
crowds of people interested in talking to him.  P.I. Tr. at 30-
31, 33-34, 96, 101-02, 407-08, 414.

37

85.   Innerlight generally asked Dr. Young to come out with a new product or products to be unveiled at the national convention each year.  11/14/06 Trial Tr. at 55-56, 109.

86.   Innerlight sponsored a 22-city book tour promoting Dr. Young's pH Miracle book.  Innerlight had no rights to Dr. Young's book, but did the book tour to attract people interested in Dr. Young's book who might also be interested in his nutritional products.  P.I. Tr. at 102-05.

87.   McAnly and Shelley Young did a tour in 12 or 15 cities in which they promoted the benefits of Innerlight products for women and children.  P.I. Tr. at 101.

88.   Innerlight covered all of the Youngs' expenses at conventions and the tours, including air and ground transportation, meals, and hotel rooms.  P.I. Tr. at 47.

(5)   Increased Sales

89.   After the acquisition, sales increased steadily. Customers signed up to receive autoships each month, and the Shipping Department went from sending 60 to 70 packages per day to sending hundreds of packages per day.  At their peak, monthly sales exceeded $2,000,000.  P.I. Tr. at 35; Def. Sur-Repl. Br. Ex. F.

G.   <u>The Youngs' Separate Activities</u>

(1)   <u>The Youngs' Website</u>

90.   The Youngs maintained a website, and Innerlight's website originally linked to it.  Eventually, however, Quigley Corp. and/or its attorneys discovered that the Youngs' website contained things that they perceived as non-compliant with FDA regulations.  Believing that the FDA scrutinizes a company such as Innerlight more heavily than individuals such as the Youngs, Innerlight removed the link to the Youngs' website from its website.  Distributors, however, continued to promote the Youngs' website vigorously.  P.I. Tr. at 99-100, 133.

91.   On their website, the Youngs sell several different products, including a trampoline, a water machine, tapes, books, and educational materials.  Distributors and others can opt to receive regular information from the Youngs on the website.  P.I. Tr. at 168-69.

92.   Prior to November of 2005, no nutritional products were sold on the Youngs' website.  There were brief descriptions of Innerlight products and links to main Innerlight websites, where those products could be purchased.  There was no mention of nutritional products of other companies on the Youngs' website.  P.I. Tr. at 169.

(2)   Separate Businesses and Products

93.   After the acquisition, the Youngs operated the company Young Naturals.  Because the Youngs could not obtain the "youngnaturals.com" web address, as it was associated with a pornography site, the name "Young Naturals" was eventually changed to "pH Miracle."

94.   Dr. Young continued to develop products after the acquisition, including books and tapes.  The Youngs sold these products under various business names, such as the Young Research Center and the Innerlight Biological Research Center ("the Center"), but these entities were one and the same.  P.I. Tr. at 133-34, 230-35.

95.   At the Center, Dr. Young saw clients for whom he did dietary and supplementation consultations.  The Center was also involved in retreats and microscopy classes.  P.I. Tr. at 230.

H.   Problems

96.   Over time, several problems arose in the business relationship between the plaintiffs and the defendants.

(1)   Resale of Innerlight Products

97.   First, there was the issue of resale.  The Youngs resold "a lot" of the product that they purchased from Innerlight

under § 1.10 of the APA.  For example, the Youngs sold Innerlight products to professionals and retail customers through the Center.  They may have sold to "more than a thousand" customers. P.I. Tr. at 241, 324-25, 412.

98.  Some of the people who attended the Youngs' retreats, where the Youngs resold Innerlight products, were Innerlight distributors.  Dr. Young would solicit distributors to attend his retreats at conventions.  For example, Czerneski was solicited by Dr. Young to attend retreats.  P.I. Tr. at 241, 324-25, 412.

99.  When people called the Center, the staff would ask whether the caller was an Innerlight distributor.  If so, the staff was supposed to tell the caller to buy through Innerlight. 11/15/06 Trial Tr. at 210.

100.  Innerlight gave Dr. Young a better discount on the products than the APA provided.  Howell gave Christiansen the list of prices to charge Dr. Young.  Pl. Ex. 33; Def. Ex. 107; Def. Ex. 122; 11/13/06 Trial Tr. at 188-91.

101.  Early in her tenure with Innerlight, McAnly got complaints from distributors who stated that their customers and distributors under them were buying Innerlight products directly from Dr. Young's office.  This was a problem because the distributors would not get commissions on these sales.  For example, Dr. Young would provide Innerlight products to patients

in his studies, but distributors complained that the participants in these studies were often also distributors, and so Dr. Young's distribution of the products to them deprived the distributors above them of their commissions.  P.I. Tr. at 106-07; 11/14/06 Trial Tr. at 30-32.

102.  McAnly became concerned that Dr. Young was purchasing too much product.  Between June of 2002 and January of 2006, Innerlight sold Dr. Young Innerlight products for a total of $127,314.99 at his discounted rate.  The full retail price for the products was $954,862.43.  The difference between these two figures is $827,547.44.  Def. Ex. 44; Pl. Ex. 58; 11/13/06 Trial Tr. at 131-32, 155-58.

103.  Worried that Dr. Young was selling Innerlight product to Innerlight customers and distributors, Innerlight requested a list of the Center's clients.  The Center provided such a list.  The list is dated August 5, 2002.  11/13/06 Trial Tr. at 186-88; 11/14/06 Trial Tr. at 22-24, 104-09; 11/15/06 Trial Tr. at 207-11; Def. Ex. 104.

104.  Out of the approximately 600 names on the list, 306 were Innerlight distributors.  No one is ever deleted from Innerlight's database of distributors, so some of these people could have stopped being active Innerlight distributors. 11/13/06 Trial Tr. at 121, 151-54.

42

105.   Thereafter, the Center was to direct all requests for products to Innerlight, and Innerlight was to give the Center's clients the discounts that the clients had enjoyed with the Center.   Innerlight was to send Dr. Young the difference between the price for which Innerlight sold the products to the customer and the price that Dr. Young would have paid Innerlight for the products.   11/14/06 Trial Tr. at 22-24, 104-09; 11/15/06 Trial Tr. at 207-11; Def. Ex. 104.

106.   Innerlight stopped making these payments to the Youngs about a year later.   There was no testimony about whether the Center resumed sales to consumers at a certain point as a direct result of Innerlight's actions or consumers' complaints. 11/14/06 Trial Tr. at 22-24, 104-09; 11/15/06 Trial Tr. at 207-11.

107.   On June 6, 2005, Wesley Tate, Executive Vice President and COO of Innerlight, sent an e-mail to the Youngs informing them that their monthly personal purchases would be limited to $100 at their discounted rate.   Def. Ex. 35.

108.   Dr. Young gave some of the product away to people who attended retreats or microscopy classes, for research, and to an orphanage in Curaçao.   The Court cannot determine how much product was given away because no documentary evidence of such give-aways is on the record.   11/13/06 Trial Tr. at 78-81.

43

109.   Any giveaways of Innerlight products to charity
or for use in studies would have been reflected in the Center's
invoices as zero balances.  Fewer than 30 such zero balances
appear in the Center's records of its invoices for the period
between January of 2001 and December of 2004, during which the
Center made hundreds of sales.  11/13/06 Trial Tr. at 79-81; Def.
Ex. 113.

110.  The Center did not keep any records of the volume
of product given away at retreats or microscopy classes.
11/13/06 Trial Tr. at 81.

111.  At the time of trial, Dr. Young had a total of
378 units of Innerlight products on hand at his ranch.  Def. Ex.
106; 11/14/06 Trial Tr. at 101-03.

112.  Dr. Young's invoices to his customers from 2001
to 2005 total $297,012.54 after adjustments for duplicates.
After subtracting freight, tax, and other costs not related to
the sale of the product, the amount of sales is $267,846.21.
Other direct costs came to about $140,000.  The defendants did
not produce any evidence of indirect costs associated with the
sales.  Def. Ex. 113; 11/14/06 Trial Tr. at 101-03; 11/15/06
Trial Tr. at 66-69, 86-88.

113.  Innerlight's records show that Dr. Young
purchased nearly $13,500 worth of Innerlight products after
December 21, 2004.  The Center's records show no sales of

Innerlight products after that date.  The Center made no sales of
Innerlight products during 2005.  Def. Ex. 113; Pl. Ex. 58;
11/14/06 Trial Tr. at 175-77.

114.  Marie Dahlen is a microscopist.  On April 4,
2002, the Center sent Dahlen an invoice that states, "We [owe]
Marie 1,000 worth of products for referrals to microscopy
course."  The Center used Innerlight products to pay Dahlen for
referrals.[11]  11/13/06 Trial Tr. at 94-96; Pl. Ex. 76.


(2)  Attempted Renegotiations

115.  Dr. Young attempted to renegotiate his contracts
with the plaintiffs.  He met with Guy Quigley ("Quigley"),[12]
founder, Chairman, President, and CEO of Quigley Corp., and a
director of Innerlight and Darius, approximately three or four
times in Pennsylvania to discuss business related to Innerlight.
In August of 2004, at one of these meetings, Dr. Young suggested
renegotiating the terms of the agreements between the defendants
and the plaintiffs.  Although they discussed potential changes to
the agreements, including increased effort by Dr. Young in return

_____

[11]     Dr. Young's statements that he and the Center did not
use Innerlight products to pay for referrals are unpersuasive.
He admitted that plaintiffs' exhibit 76 was his document but
stated "this was not something we did."  As he described the
transaction, the Center owed Dahlen $1,000 and she "apparently
wanted to take it out in product."  11/13/06 Trial Tr. at 95.

[12]  Guy Quigley was sometimes referred to as Gary Quigley in
the testimony.

for increased commissions, none ever came to fruition.  P.I. Tr. at 391-92, 420.

### (3)  The pH Miracle Professional Line

#### a.  Generally

116.  At some point, Dr. Young began selling a line of nutritional supplement products that were not Innerlight products.  His product line is called the "pH Miracle Professional Line."  Many of the pH Miracle products, like many of the Innerlight products, are dietary or nutritional supplements.  The foundational tenet for both product lines is that ingesting the products helps to alkalize and energize the body by achieving pH balance.  P.I. Tr. at 287-88.

117.  The pH Miracle products were sold through pH Miracle LLC, which has no shareholders, no distributors, and no employees.  Its owners are the Youngs.  11/13/06 Trial Tr. at 8-10.

118.  Creation's Garden Natural Products, Inc., and Teamwork Concepts, Inc., are the manufacturers of the pH Miracle Professional Line.  Dino Guglielmelli ("Guglielmelli") is the CEO and owner of Creation's Garden.  Creation's Garden has done business with both Innerlight and pH Miracle LLC.  11/13/06 Trial Tr. at 12-14; 11/15/06 Trial Tr. at 112-14.

b.   <u>Specific Product Comparisons</u>

119.   There are similarities between certain Innerlight and pH Miracle nutritional supplement products.   The Court finds that these similarities were willful and intentional.[13]   The following products are competitive with each other.[14]   Each row represents a pH Miracle product and a corresponding Innerlight product with which it competes.   In a given row, the two products listed are substitutes for each other or are substantially equivalent to each other:

| pH Miracle Product | Innerlight Product |
|---|---|
| Greens | SuperGreens |
| Biolive Sprouts | SuperSoy Sprouts |
| Terra Cleanse | Earth Essence Clay |
| Activator | Prime pH |
| Cell Power | BioLight |

---

[13]   The Court does not find credible Dr. Young's testimony that the similarities of the products and in some cases their labels was coincidental.

[14]   In determining the product ingredients, the Court employed the following methodology.   First, when available, the Court gleaned the product ingredients from the product labels. From the point of view of consumers, these ingredient lists would be authoritative.   The plaintiffs did not, however, provide the Court with samples of all of the Innerlight products with which they allege the pH Miracle products compete.   When the Court did not have a product sample, it relied upon a product comparison sheet developed by Dr. Young.   When the Court did not have a sample and the product was not listed on Dr. Young's product comparison sheet, the Court relied upon testimony from the trial, preliminary injunction hearing, or the plaintiffs' answers to interrogatories.

| Silver Defense | Silver Plus |
|---|---|
| Opti Oils | Marine Lipids/Borage Oil |
| Osteoplex I | Orthoplex I |
| Osteoplex II | Orthoplex II |
| Nutrient Bridge | Z-Link |
| Minerals | Mega-Vita-Min |

3d Am. Compl. ¶ 43; Def. Ex. 20; P.I. Tr. at 312, 359.

120.   According to their labels, the common ingredients in pH Miracle Greens and Innerlight SuperGreens are kamut grass*[15], barley grass*, lemon grass, shave grass, wheat grass*, bilberry leaf, alfalfa leaf, dandelion leaf, black walnut leaf, blackberry leaf, plantain leaf, red raspberry leaf, bolodo leaf, papaya leaf, strawberry leaf, rosemary leaf, white willow bark, blueberry leaf, slippery elm bark, marshmallow root, pau d'arco bark, beta carotene, rose hips fruit, couch grass, meadowsweet herb, oat grass, soy sprouts, kale leaf, spinach*, okra fruit, cabbage herb*, celery seed, parsley leaf, broccoli floret*, tomato fruit*, watercress herb, alfalfa leaf juice, peppermint leaf, spearmint leaf, wintergreen leaf, sage leaf, and thyme leaf.   SuperGreens alone contains goldenseal leaf, soy lecithin, cornsilk, echinacea tops, turmeric rhizome, mineral mix, and aloe.   PH Miracle Greens alone contains avocado.   Both products

---

[15]   Where indicated with an asterisk, the pH Miracle ingredient is labeled "organic," but the Innerlight ingredient is not.

contain 8 calories, 645 IU of Vitamin A, and 3 grams of
proprietary blend.  The bottles are white, cylindrical, and
approximately the same size.  The pH Miracle product has a
picture of the defendants on the label.  Both labels prominently
feature the color green.  Pl. Exs. 1, 13.

121.  According to their labels, pH Miracle Activator
and Innerlight Prime pH both contain sodium chlorite.  The pH
Miracle product alone contains potassium carbonate and potassium
hydroxide.  Both products are sold in virtually identical blue
glass bottles with black droppers.  Both labels feature the color
red.  The pH Miracle product label contains a photograph of the
Youngs.  Both products are mixed with their respective companies'
greens product in water, with the purpose of raising the pH of
the water.  Pl. Exs. 2, 17; P.I. Tr. at 306.

122.  According to their labels, pH Miracle Biolive
Sprouts and Innerlight SuperSoy Sprouts both contain certified
organic soy sprouts.  The Innerlight product also contains
lecithin, but the pH Miracle product does not.  Both contain
13.95 calories, 5.5 calories from fat, 0.61 grams of total fat,
0.1 grams of saturated fat, no cholesterol, 3.9 mg of sodium, 0.9
grams of total carbohydrate, 0.6 grams of dietary fiber, 0.2
grams of sugars, 1.25 grams of protein, 1.5 iu of vitamin A, 11.1
mg of calcium, and 200 mcg of iron.  Both are sold in cylindrical

white containers.  The pH Miracle product label contains a photograph of the Youngs.  Pl. Ex. 26; Def. Ex. 2.

123.  According to their labels, pH Miracle Terra Cleanse and Innerlight Earth Essence Clay both contain montmorillonite clay as their key ingredient.  The Innerlight clay, in contrast to the pH Miracle clay, is premixed and contains aloe vera and purified water.  The Innerlight clay was sold before the pH Miracle clay.  P.I. Tr. at 327, 398; Def. Exs. 10, 76.

124.  A bottle of pH Miracle Cell Power is in evidence, but there is no sample of Innerlight Biolight in evidence. According to Dr. Young's product comparison sheet, both products contain colloidal NADP, silica (in two different forms), and de-mineralized water (though the water in Cell Power is "plasma activated").  Cell Power alone contains colloidal silver, colloidal vandium, colloidal magnesium, and colloidal chromium. Def. Exs. 9, 61.

125.  According to their labels, pH Miracle Silver Defense and Innerlight SilverPlus both contain identical amounts of colloidal silver, colloidal gold, colloidal copper, and colloidal titanium.  They also both contain de-mineralized water. Both products come in blue bottles with black droppers.  The pH Miracle product label contains a photograph of the Youngs.  Pl. Ex. 27; Def. Ex. 11.

126.   A bottle of pH Miracle Opti Oils is in evidence, but there is no sample of Innerlight Marine Borage in evidence. According to Dr. Young's product comparison sheet, the products both contain borage oil, fish oil, and vitamin E.  The pH Miracle product alone contains flax oil, and the Innerlight product alone contains safflower oil.  Pl. Ex. 19; Def. Ex. 61.

127.   According to their labels, pH Miracle Osteoplex I and Innerlight Orthoplex I both contain colloidal silica and de-mineralized water.  Their other ingredients differ.  They both come in virtually identical blue bottles with black droppers that feature the color teal.  The Youngs' photographs appear on the pH Miracle product label.  Pl. Ex. 29; Def. Ex. 6.

128.   A bottle of pH Miracle Osteoplex II is in evidence, but there is no sample of Innerlight Orthoplex II in evidence.  According to Dr. Young's product comparison sheet, both products contain manganese and magnesium (although in two different forms), calcium ascorbate, vitamins D, B1, B2, B3, B6, and B12, choline, betaine, and RNA-DNA (although from different sources), and aloe.  Several other ingredients in the products are different.

129.   A bottle of pH Miracle Nutrient Bridge is in evidence, but there is no sample of Innerlight Z-Link in evidence.  According to Dr. Young's product comparison sheet, these two products contain the following ingredients in common:

vitamin A, niacin, vitamin B6, folic acid, zinc, dandelion root, red clover, chickweed, cayenne, althea root, and aloe.  Nutrient Bridge alone contains mineral cell salts, and Z-Link alone contains bovine RNA and a bovine gelatin capsule.  Def. Exs. 4, 61.

130.  A bottle of pH Miracle Minerals is in evidence, but there is no sample of Innerlight Mega-Vita-Min in evidence. Innerlight Mega-Vita-Min is not described in Dr. Young's product comparison sheet.  The Minerals label lists calcium, potassium, magnesium chelate, and a Proprietary Trace Mineral Blend of several different elements as ingredients.  In Innerlight's answer to an interrogatory, it lists the Mega-Vita-Min ingredients as including calcium, potassium (combined with other minerals) and magnesium (combined with other minerals), along with several other ingredients.  P.I. Tr. at 334; Pl. Ex. 20.

131.  There are no Innerlight products that are equivalent or analogous to the pH Miracle products Core Cleanse, CLA Boost, HCA Plus, and L-Carnitine ("the four disputed products").  11/14/06 Trial Tr. at 134-37; Def. Exs. 68, 71.[16]

---

[16]    Although the defendants mention Miracle-Vitamins in their Post Trial Memo as another pH Miracle product without an Innerlight counterpart, no evidence or testimony was presented on this product.  Def. Post Trial Memo. at 6.

c.   Sale of pH Miracle Products and Use of
Trademarks

132.   Dr. Young first put the pH Miracle products up
for sale indirectly through his website on November 28, 2005.  On
the website, prospective purchasers were asked if they are
Innerlight distributors.  The website also linked to pages where
Innerlight products were available for purchase.  As of November
28, 2005, the pH Miracle Professional Line was not specifically
mentioned anywhere on the website.  The website only contained
pictures of Innerlight products.  The main page of the website
contained a testimonial by Tammy Copenhaver thanking the Youngs
for assuring her "a life free of cancer, and filled with
Innerlight."  It also contained the word "Innerlight" in the
section offering information and the purchase of Innerlight
products, which appeared directly below the section offering
information and the purchase of pH Miracle products.  The "Inner
Link" mark was displayed on the website as well in conjunction
with the pendant.  In addition, the website contained the phrase
"Discover the Alkalarian Approach to Optimal Living."  After
filling out the information sheet on the website, however,
prospective customers were sent information on and invited to
purchase from the pH Miracle Professional Line.  P.I. Tr. at 244-
48, 329; Pl. Exs. 10-11, 22.

133.   Between November of 2005 and April of 2006, the
pH Miracle Center sold $335,244.55 worth of pH Miracle products.

Of this, $43,902.26 is attributable to the four disputed products
and $17,467 to Terra Cleanse.  A total of $273,875.29 is
attributable to the other pH Miracle products.  Pl. Ex. 35; Pl.
Post-Trial Memo. at 2-3.

134.  After accounting for discounts that the pH
Miracle Center gave to certain purchasers, the sales total
$302,614.92.  Pl. Ex. 35.

135.  The pH Miracle Center paid its suppliers a total
of $83,077.48 for the products.  Of this, $8,647.35 was for the
four disputed products, and $3,312.80 was for Terra Cleanse,
leaving $71,117.33 in costs for products other than the four
disputed products and the clay.  Pl. Exs. 48-50; 11/14/06 Trial
Tr. at 157-58.

136.  In November of 2005, Quigley had two friends go
onto the Youngs' website.  These friends were James Doyle, a
resident of Doylestown, Pennsylvania, and Julie Powers, a
resident of West Chester, Pennsylvania.  Neither Powers nor Doyle
has a business affiliation with any of the parties.  P.I. Tr. at
143-44; Pl. Ex. 11.

137.  Doyle googled Dr. Young and found his website.
He called the number on the website and spoke to someone named
Andrew.[17]  Doyle told Andrew that he was looking for a greens
product.  Andrew said that he would have to fill out an

---

[17]    Andrew is the Youngs' son.  P.I. Tr. at 332.

information sheet on the website and send it in, and that he would be sent a file of product information.  The information sheet asked if Doyle was an Innerlight distributor, and he said no.  Doyle filled out the sheet and received an e-mail the next day from the website.  The e-mail contained a PDF file with a product list.  P.I. Tr. at 144-53.

138.  Doyle called the number again and spoke to Andrew, explaining that he did not understand the product information.  Andrew recommended various products.  Andrew did not ask whether Doyle was affiliated with Innerlight.  Doyle assumed that the products were made by Dr. Young, and the only name he knew for the products was "Greens."  Doyle said he would review the information.  P.I. Tr. at 144-53.

139.  He then called back and said that he was only interested in a few products.  He also asked whether there were any products that could help his wife with her multiple sclerosis.  Andrew said yes, and asked him to hold.  Doyle heard talking in the background.  Andrew then recommended various products, and Doyle asked if there were a few with which he could start out.  Andrew recommended six or seven items, and Doyle proceeded to order them, giving Andrew his credit card information.  He paid approximately $322 for them.  P.I. Tr. at 144-53.

140. The products were sent to Doyle's home in the mail. They were pH Miracle products, and included Opti Oils, Terra Cleanse, Core Cleanse, Biolive Sprouts, Greens, and Activator drops. Doyle and his wife did not use the products. P.I. Tr. at 144-53.

141. After receiving the products, Doyle received regular e-mails from the pH Miracle website, which included holiday greetings and information about products, services, seminars, retreats and a blood-testing service. P.I. Tr. at 144-53.

142. Quigley eventually looked at the products and informed Doyle that they were not his company's products. He reimbursed Doyle for the products. P.I. Tr. at 144-53.

143. On November 29, 2005, Powers visited Dr. Young's website. She clicked on the "Products" link, and then a "For Information Only" link which allowed her to view products labeled as "Innerlight" products. The "Products" page also allowed her to click on a link labeled "I am an individual interested in purchasing your products," which directed her to a personal information form to be filled out. That page also informed her that someone would contact her to assist her with the products. Powers was asked if she was an Innerlight distributor, and responded, "No." Moments later, she received an e-mail from the

Youngs stating that someone would contact and assist her.  Pl. Ex. 11.

144.  Powers then called the phone number on the pH Miracle Center website, and spoke to a person named Andrew. Andrew recommended 35 products, or seven at a minimum.  Powers told him she could not afford that, and mentioned "greens" and "drops" that she had heard about.  Andrew responded that those were the "best ones," and that they were a brand new product line developed within the last month by the Youngs.  Powers asked why there was information about Innerlight products on the website, and Andrew responded that that was an older line of products. Powers requested additional information, and ended the call.  She then received an e-mail from "Andrew at the pH Miracle Center Staff" with product information about the pH Miracle Professional Line.  Pl. Ex. 11.

145.  Powers ordered pH Miracle Greens and the pH Miracle Activator, along with a water bottle.  She gave her credit card information and requested second-day air delivery. She received the package at her home via UPS two days later.  She paid $159.44 for the products, and was reimbursed by the plaintiffs.  The seller was listed as "Innerlight Biological R" of Alpine, Utah.[18]  She did not use the products, and she

---

[18]    Other pH Miracle receipts contained the words "Innerlight Foundation," "Innerlight Biological," and "Innerlight Solutions."  Mot. for Prelim. Inj. Exs. E, G.

delivered them to Quigley.  Since receiving the products, she has
received approximately 23 additional e-mails from the Youngs,
advertising upcoming events.  Pl. Exs. 11, 12, 16, 17; P.I. Tr.
at 194-99.

146.  At some point between December 15, 2005 and
December 21, 2005, the Youngs' website was changed.  After the
change, it contained pictures of both pH Miracle and Innerlight
products and allowed customers to click on links to get
information about and purchase both types of products.  The links
allowing customers to get information about or purchase pH
Miracle products appeared above the links relating to Innerlight
products.  Pl. Ex. 10; P.I. Tr. at 331-32.

147.  At some point after April of 2006, Dr. Young
dropped "Alkalarian" from the Center's website and substituted
"Alkavorian."  11/13/06 Trial Tr. at 87-89.

148.  As of November 1, 2006, the pH Miracle Living
website mentioned and depicted Innerlight products.  Pl. Ex.
54ee-54ff.

d.  Harm to Innerlight

149.  Dr. Young never told Quigley or McAnly that he
would be launching the pH Miracle Professional Line.  P.I. Tr. at
393, 432; 11/14/06 Trial Tr. at 39-40.

58

150.   Word of the pH Miracle Professional Line traveled quickly among Innerlight distributors.   In early to mid-November of 2005, Brogan became aware of Dr. Young's pH Miracle Professional Line.   Czerneski received an e-mail from Donna Mathias, who also gave testimonials at Innerlight conventions about her cancer reversal, and a Dr. Videan, encouraging him to follow Dr. Young to his new product line on November 20, 2005. By late November or early December, most of the distributors had learned of the pH Miracle Professional Line.   Czerneski's income and the income of his wife, who is also a full-time Innerlight distributor, decreased by almost half from Thanksgiving of 2005 to January of 2006.   At least one distributor that Czerneski worked with for the previous four years left Innerlight to pursue Dr. Young's new product line.   P.I. Tr. at 172-75, 410-13.

151.   As of March 9, 2006, Dean and Laurette Synder, two former Innerlight distributors, operated a website that described and promoted the pH Miracle Professional Line.   The website is www.snyderhealth.com.   The website pays commissions to downline distributors through its "Affiliate Program."   Despite the defendants' representation to the Court on March 14, 2006, that references to pH Miracle products would be removed from the website pending the outcome of the Court's preliminary injunction opinion, such references remained on the website for another day. They were then removed.   3/9/06 Letter from Frederick Tecce Exs.

1-4; 3/14/06 Letter from Warren E. Kampf with Counter-Decl. of
Dean Snyder; 3/15/06 Letter from John P. McShea with Attachments;
3/15/06 Letter from Warren E. Kampf.

      152.   Richard Adgo ("Adgo") is one of Dr. Young's
clients.  He attended a pH Miracle retreat at some point.  He was
never an Innerlight distributor.  11/13/06 Trial Tr. at 40;
11/14/06 Trial Tr. at 150-52, 158-60.

      153.   As of October of 2006, Adgo maintained the
website www.phmiraclepacific.co.nz, based in New Zealand.  The
website offered for sale numerous pH Miracle products.  The
website discussed Adgo's involvement with Dr. Young and linked to
the Center's website, www.phmiracleliving.com.  Adgo's website
used a drawing of a fish bowl by Shelley Young and the phrase
"when the fish is sick change the water."  Dr. Young testified
that he had not known about this website until he saw the trial
exhibit, did not have an arrangement with Adgo, did not receive
funds from Adgo, and intended to ask Adgo to stop using the fish
bowl logo.  The Court has concerns about Dr. Young's credibility,
but the plaintiffs have not shown by a preponderance of the
evidence that Dr. Young knew about or encouraged Adgo's sale of
pH Miracle products.  11/13/06 Trial Tr. at 91-93; 11/14/06 Trial
Tr. at 150-52, 156-60; Pl. Ex. 55.

      154.   As discussed in more detail below, an individual
named Brock Doxey ("Doxey") sold pH Miracle products between

April of 2006 and November of 2006.  11/15/06 Trial Tr. at 169-75, 179-202.

155.  In 2004, 2005 and 2006, Innerlight sales ranged from a high of $2,132,689.13 in March of 2004 to a low of $1,092,514.20 in September of 2006 (the latest month for which evidence was presented).  From 2003 to 2004, sales decreased 2.35%.  From 2004 to 2005, sales decreased 0.28%.  Pl. Ex. 73c; 11/13/06 Trial Tr. at 202-04.

156.  Year-to-date sales through September of 2006 were 21% lower than year-to-date sales through September of 2005. Sales in August and September of 2006 were more than 30% lower than during those months in 2005.  During August and September of 2006, recruiting of new distributors was down 50% since the same months in 2005.  Pl. Ex. 73c; 11/13/06 Trial Tr. at 202-04.

157.  A major contributing factor to these declines was the decrease in Dr. Young's participation in Innerlight activities and then his coming out with the pH Miracle Professional Line.  11/14/06 Trial Tr. at 32-39.

158.  Until the February 2008 sale to Innerlight Holdings, Innerlight constituted Quigley Corp.'s Health and Wellness Division.  Innerlight's financial results were reported under the Health and Welfare Division heading in Quigley Corp.'s 10-K and 10-Q filings with the Securities and Exchange Commission ("SEC").  11/15/06 Trial Tr. at 56-58, 63-65.

159.  During the first quarter of 2006, Innerlight had a negative profit margin as reflected in Quigley Corp.'s 10-Q. Def. Ex. 102 at 14; 11/15/06 Trial Tr. at 71.

160.  During 2005, Innerlight's profit margin was 4.9% as reflected in Quigley Corp.'s 10-K.  11/15/06 Trial Tr. at 71, 108-10.[19]

161.  If Innerlight had had greater sales during 2005, its profit margin would have been higher because it would have incurred no further fixed costs in making those sales.  11/15/06 Trial Tr. at 108-10.

162.  Innerlight's gross profit on any additional revenue would have been about 35%, give or take a few points, after paying for the cost of the goods, commissions, and freight. The cost of salaries and rents would not have increased.  Given the range to which Innerlight's controller, Heber Maughn, testified, the Court will use a margin of 33% in calculating Innerlight's lost profits.  11/15/06 Trial Tr. at 108-10.

163.  Applying this 33% profit margin to the $273,875.29 in sales of pH Miracle products that competed with Innerlight products, the Court calculates that Innerlight lost

---

[19]    The 10-K admitted into evidence is from March of 2005 and as such does not reflect the 2005 profit margin.  The Court relies on the testimony of the Youngs' expert witness, Kenneth Avery, and Innerlight's controller, Heber Maughn.  Def. Ex. 103.

$90,378.85 in profits as a result of the sale of pH Miracle products between November of 2005 and April of 2006.

164.   Innerlight is seeking to enforce its non-competition agreement against the Youngs in order to control the goodwill and reputation of the company, to protect its investment in buying the company and expending millions of dollars on marketing and sales, and to protect its distributors.  11/14/06 Trial Tr. at 70-71.

165.   Several other providers of nutritional supplements exist in the marketplace.  Innerlight faces competition from companies such as Core Vital, New Life and USANA.  11/13/06 Trial Tr. at 218-19; 11/14/06 Trial Tr. at 62.

166.   Even with the non-competition agreement in place, Dr. Young is able to earn a substantial living.  He receives royalties on his books.  He sells books, DVDs, equipment and accessories relating to the alkalarian lifestyle.  He sells a basic microscopy course and an advanced microscopy course for $9,995 each plus the cost of equipment.  He sells retreats at his ranch for $2,495 each.  He consults with individuals for $900 per hour.  11/14/06 Trial Tr. at 185-89.

167.   Shelley Young has become involved in microscopy and was attending art school at the time of the trial.  11/15/06 Trial Tr. at 4-5.

e.   The Defendants' Profits on Sales of pH
Miracle Products

168.  The Youngs took in $302,614.92 in revenue from

the sales of pH Miracle products between November of 2005 and

April of 2006.  This sum excludes a large individual sale that

occurred in April of 2006 and that does not appear in the pH

Miracle Center's records.  The Court will discuss that sale,

which the parties have termed the Ordway transaction, below.  Pl.

Ex. 35.

169.  The Court cannot determine from the exhibits how

much of this post-discount revenue was derived from the four

disputed products and the Terra Cleanse.  The Court will

therefore calculate the approximate revenues for those products

by dividing the post-discount revenue ($302,614.92) by the total

revenue ($335,244.55), and then multiplying the result by the

total revenue attributable to the four disputed products and the

Terra Cleanse ($61,369.26).  This results in $55,396.14 in post-

discount revenues attributable to the four disputed products and

the Terra Cleanse.  Subtracting that sum from $302,614.92, the

Court obtains $247,218.78 as the defendants' total post-discount

revenue from the non-disputed, non-clay products.

170.   The Youngs did not produce any evidence of indirect costs of producing and selling pH Miracle products.[20] 11/14/06 Trial Tr. at 163-66;[21] 11/15/06 Trial Tr. at 67-71.

171.   The defendants provided invoices from suppliers of the pH Miracle Professional Line to show their direct costs for the pH Miracle products.  These costs, excluding costs for the four disputed products and the clay, come to $71,117.33. Subtracting that sum from $247,218.78, the Court obtains $176,101.45 as the Youngs' total profits from the sales of competing pH Miracle products other than the Ordway transaction. Pl. Exs. 48-50.

---

[20]   The defendants' expert witness, Kenneth Avery, did not testify about the Youngs' profits on pH Miracle sales.  He testified only about the Youngs' profits on resale of Innerlight products and Innerlight's lost profits on the Youngs' sale of pH Miracle products.  The testimony is confused at points.  It appears that Avery calculated the pH Miracle Center's gross sales multiplied by Innerlight's profit margin as stated in Quigley Corp.'s SEC filings.  In response to a question about whether he was able to calculate Dr. Young's profits from the sale of pH Miracle products, Avery responds that he was assuming that Innerlight would have made the same sales if Dr. Young had not made those sales and he therefore used Innerlight's profit margin in order to calculate Innerlight's lost profits.  11/15/06 Trial Tr. at 70-71.

[21]   The Court did not find credible Dr. Young's testimony that he and his comptroller allocate 20% of the ranch's overhead to the pH Miracle product business.  The defendants did not back up this self-serving testimony with any documentation, such as the pH Miracle Center's accounting or tax records.  11/14/06 Trial Tr. at 129-34.

(4)   <u>New Products</u>

172.   There are several products that Innerlight has been selling that were developed after the acquisition.  The parties disagree about who developed these products, none of which are listed on Exhibit A to the APA because they post-date the acquisition.  11/14/06 Trial Tr. at 58-60.[22]

173.   Christiansen was Dr. Young's contact person at Innerlight for new products.  11/13/06 Trial Tr. at 168.

174.   Counsel for the Youngs sent letters to counsel for Innerlight on September 14, 2005, and March 27, 2006, stating that the Youngs were exercising their right to revoke all licenses and rights to use their products and intellectual property.  The Youngs asserted that they developed the new products and therefore retained the rights to them despite allowing Innerlight to market them.  Def. Exs. 84, 130B.

a.   Doc Broc

175.   Dr. Young developed the Doc Broc vitamins and chewable greens in 2001.  Shelley Young provided the artwork for the label.  P.I. Tr. at 130; 11/13/06 Trial Tr. at 182, 85;

---

[22]   The defendants included BioGen, InLighten Advanced Formula Shampoo and Conditioner, InLighten Advanced Formula Pack, and InLighten Skin Care Pack in the list of products allegedly subject to oral agreements and licenses between Innerlight and the Youngs.  No evidence or testimony was presented on these products.  Similarly, there was testimony on Earth Essence Clay without peppermint, but not on the variations with peppermint.

11/14/06 Trial Tr. at 113-15; Def. Ex. 74; 11/15/06 Trial Tr. at 12-13.

176.   Innerlight has discontinued sales of Doc Broc because it did not sell well.  11/14/06 Trial Tr. at 55-56.

b.   InLighten Everyday Shampoo, InLighten Everyday Conditioner, and InLighten BioTin Hair Tonic Spray

177.   McAnly asked Dr. Young to develop a shampoo, a conditioner, and a hair tonic.  She agreed to pay him 5% of sales of those products.  11/14/06 Trial Tr. at 52-55.

178.   Shelley Young came up with the name "InLighten" for the hair care products.  11/13/06 Trial Tr. at 170.

179.   Dr. Young sent samples of the shampoo to Christiansen.  When Christiansen received the samples, they were in unlabeled bottles from which a previous label had been removed.  The bottles were sticky.  McAnly sent the samples to a manufacturer called Cosmetic Specialties.  Cosmetic Specialties created a formula and ingredient list for the shampoo and conditioner based on the samples.  11/13/06 Trial Tr. at 147-48.

180.   Christiansen, McAnly, Dr. Young, and Cosmetic Specialties engaged in some back and forth about the specific ingredients that should go into the shampoo and conditioner. 11/13/06 Trial Tr. at 148, 170-75; 11/14/06 Trial Tr. at 109-10; Def. Exs. 202, 203.

67

181.   Innerlight still sells the shampoo and conditioner.  11/13/06 Trial Tr. at 176; Def. Exs. 77-78.

182.   Dr. Young supplied the formulation for Innerlight's BioTin hair tonic.  Creation's Garden was the manufacturer for the hair tonic.  11/13/06 Trial Tr. at 175.

183.   Dr. Young worked with a company called Teamwork Concepts to come up with a certificate of analysis listing the ingredients for the hair tonic.  11/14/06 Trial Tr. at 111-12; Def. Ex. 204.

184.   Innerlight discontinued sales of the hair tonic at some point in 2004 or 2005 due to lack of sales.  11/13/06 Trial Tr. at 175-76.

c.   Earth Essence Clay

185.   Cosmetic Specialties came up with the specific formulation for Innerlight's Earth Essence Clay product.  Dr. Young referred Innerlight to the company that provided the clay itself.  He also suggested the inclusion of certain ingredients in the product, including aloe and grape seed extract.  11/13/06 Trial Tr. at 149, 177-78.

186.   The clay was developed in order to be ready to launch at Innerlight's 2003 or 2004 convention.  Dr. Young gave a presentation about the clay at that convention.  There was no

clay product listed on Exhibit A to the APA.  11/14/06 Trial Tr.
at 56, 118-19; Def. Ex. 114; Pl. Ex. 33, tab 2.

187.  All parties consider the clay to be a nutritional
product because one of its uses is to be ingested in small doses.
11/13/06 Trial Tr. at 177; 11/14/06 Trial Tr. at 117-18; Def.
Exs. 105, 114.

188.  The parties never had a written royalty agreement
regarding Earth Essence Clay.  McAnly and Dr. Young had an
implicit understanding that Innerlight would pay Dr. Young a 5%
commission, as it had done for products listed on Exhibit A to
the APA.  11/14/06 Trial Tr. at 56, 59, 116.


        d.   SuperSoy Sprouts Powder

189.  At some point, Innerlight came out with a soy
powder product.  This product is named SuperSoy Sprouts and is
distinct from the SuperSoy Sprouts capsule that appeared on
Exhibit A to the APA.  11/14/06 Trial Tr. at 52-53; Pl. Ex. 33,
tab 2.

190.  Innerlight did not ask Dr. Young to develop the
powder.  Instead, Dr. Young had a soy powder that he gave to
Shelley Young to show to McAnly.  Shelley Young showed the powder
to McAnly during the tour that the two of them did together.
McAnly liked the taste of the powder and asked the Youngs whether
Innerlight could sell the powder.  Innerlight paid the Youngs 5%

on sales of the powder.  11/14/06 Trial Tr. at 52, 123-25; 11/15/06 Trial Tr. at 28-29.[23]

191.    The powder and the capsule have slightly different formulations and the same name.  11/13/06 Trial Tr. at 179-80.

192.    The SuperSoy Sprouts powder is a modification of the capsule under § 1.02 of the APA.  11/14/06 Trial Tr. at 123-25; 11/15/06 Trial Tr. at 28-29; Def. Post Trial Br. at 6.

193.    Creation's Garden is the manufacturer of the powder.  11/13/06 Trial Tr. at 150-51.

e.    Aqua O$_2$ MSM and Aqua O$_2$ Selenium

194.    Aqua O$_2$ MSM is Prime pH plus MSMK, a protein marketed as helping to neutralize acid.  11/14/06 Trial Tr. at 121; Def. Ex. 72.

---

[23]    The Court is not convinced by McAnly's contrary testimony that Dr. Young was not involved at all in developing the SuperSoy Sprouts powder.  The Youngs' version of the events is more detailed and makes more sense.  McAnly flatly denied that Dr. Young had anything to do with the powder and that the powder had anything to do with the earlier, capsule form of SuperSoy Sprouts.  McAnly testified that if one were to break open the capsule, its contents would not resemble the powder.  McAnly did not explain how the powder was in fact developed, nor why it had the same name as the capsule.  Christiansen testified that she did not know who developed the powder and that her only involvement with the product was to place the purchase orders.  11/14/06 Trial Tr. at 52-53, 60; 11/13/06 Trial Tr. at 150-51, 179.

195.   Aqua $O_2$ MSM is Prime pH plus selenium.  Selenium is marketed as promoting heart health.  11/14/06 Trial Tr. at 122; Def. Ex. 75.

196.   Both products are dietary supplements.  11/14/06 Trial Tr. at 121-22; Def. Exs. 72, 75.

197.   Dr. Young developed both products after the acquisition, in 2001 or 2002.  Neither is on Exhibit A to the APA.  11/14/06 Trial Tr. at 121-22; 11/13/06 Trial Tr. at 182.

198.   Innerlight no longer sells either product due to lack of sales.  11/13/06 Trial Tr. at 182.

            f.   Stabilized Oxygen Topical Spray

199.   InLighten by Innerlight Stabilized Oxygen Topical Spray is a diluted form of Prime pH intended to be sprayed on the face.  11/13/06 Trial Tr. at 181-82; 11/14/06 Trial Tr. at 56-58, 122-23; Def. Ex. 73.

200.   At an Innerlight convention in Orlando, Dr. Young told the assembled distributors that an oxygen spray from Sassoon that McAnly had brought with her when she joined Innerlight was not alkaline and was harmful.  In order to replace the oxygen spray, McAnly asked Dr. Young if a spray could be developed that was a diluted version of Prime pH.  Dr. Young agreed.  That product became InLighten Stabilized Oxygen Topical Spray.  Dr.

Young told the distributors that the new spray was alkaline.
11/14/06 Trial Tr. at 57-58, 120-23.

201.  InLighten Stabilized Oxygen Topical Spray is not
a nutritional or dietary supplement, and it was developed after
the acquisition.  11/14/06 Trial Tr. at 122-23.

202.  McAnly and Dr. Young never had a conversation
about paying Dr. Young 5% on the topical spray, but the parties
both assumed that Innerlight would pay 5%.  Innerlight did pay
Dr. Young 5%, and he promoted the product.  11/14/06 at 57-58.

g.  HCA Plus, Core Cleanse, CLA Boost,
     and L-Carnitine

203.  Prior to the entry of the preliminary injunction,
the pH Miracle Center sold the products HCA Plus, Core Cleanse,
CLA Boost, and L-Carnitine.  Innerlight has never sold these
products, nor products that are equivalent or analogous to these
products.  Dr. Young developed HCA Plus and possibly Core Cleanse
before the acquisition, but these products were not on Exhibit A
to the APA.  Dr. Young developed L-Carnitine in 2004 or 2005 and
CLA Boost in 2005.  All four of these products are sold as weight
loss products.  Core Cleanse is also marketed as helping with
digestion.  Pl. Ex. 73a;[24] 11/14/06 Trial Tr. at 134-37.

_____

[24]  Plaintiffs' Exhibit 73a mentions Fibrada as a product
that is analogous to Core Cleanse.  There was no testimony about
Fibrada, however, so the Court will include Core Cleanse among
the pH Miracle products that lack an Innerlight counterpart.  Pl.
Ex. 73a.

(5)   <u>The Set-Offs</u>

204.   Beginning in March of 2006, the plaintiffs stopped paying out commissions to the Youngs.  Instead, the plaintiffs sent monthly set-off letters to the defendants, explaining that the plaintiffs considered the defendants to be in material violation of § 6.1 of the CA and invoking their right under § 1.10 of the APA to set off their damages.  Def. Ex. 85, 87-93; 11/13/06 Trial Tr. 195-99.

205.   These set-off letters stated the amount of the commission that the Youngs would have received and stated that Innerlight was retaining that commission in order to set off its damages for various breaches by the Youngs.  Def. Ex. 85, 87-93; 11/13/06 Trial Tr. 195-99.

206.   The plaintiffs sent set-off letters on March 13, 2006, for $56,653.42; on April 12, 2006, for $62,826.64; on May 15, 2006, for $52,879.01; on June 14, 2006, for $58,967.72; on July 15, 2006, for $51,793.91; on August 15, 2006, for $47,257.61; on September 14, 2006, for $47,029.08; and on October 13, 2006, for $41,550.43.  Each month's set-off letter represented commissions that the plaintiffs would otherwise have owed the defendants for the previous month.  In total, the plaintiffs set off $418,957.82 in commissions that would

otherwise have been due for February through September of 2006. Def. Exs. 85, 87-93; 11/13/06 Trial Tr. 195-99.

207.   The plaintiffs set off the Youngs' commissions to recoup three types of damages:  (1) those from Dr. Young's resale of Innerlight products in violation of § 1.10 of the APA; (2) commissions that Innerlight had previously paid Dr. Young for Prime pH, for which Innerlight alleged that Dr. Young had misrepresented that he had good title when in fact he did not have good title; and (3) commissions that Innerlight had previously paid Dr. Young for products that were not part of the commission agreement in the APA.  Innerlight asserts that its damages for (1) are $827,547.44 (the difference between retail price for the products and what Dr. Young paid for the products), and that its damages for (2) and (3) combined are $990,032.43. In particular, (2) accounts for $721,431.93 in commissions that Innerlight paid the Youngs but now asserts were not actually due to the Youngs.  Def. Exs. 85, 87-93; 11/13/06 Trial Tr. at 195-202, 221-22; 11/14/06 Trial Tr. at 20-21; Pl. Exs. 58, 67.

208.   Innerlight did not include any damages from sales of pH Miracle products in its set-off calculations.  11/13/06 Trial Tr. at 198.

74

a.   <u>Resale of Innerlight Products</u>

209. The ratio between the retail price of the products Dr. Young bought and Dr. Young's price was 7.5:1.  Dr. Young was reasonably entitled to buy $100 of product at his discounted price.  This meant that Dr. Young was entitled to buy product worth the equivalent of $750 per month retail.  Def. Ex. 35.

210.  The sales continued for 44 months, June of 2002 through January of 2006.  If the parties had adhered to the $100 monthly limit throughout that time period, Dr. Young would have bought product worth $33,000 at retail during those 44 months.

211.  Subtracting this $33,000 from the actual retail value of the product Dr. Young bought ($954,862.43) yields $921,862.43 in retail sales that Innerlight could have made if it had not sold the extra product to Dr. Young.

212.  Applying a 33% profit margin, Innerlight would have realized a profit of $304,214.60.  Innerlight in fact received $127,314.99 from Dr. Young, for a difference of $176,899.61.


b.   <u>Prime pH</u>

213.  In 1991 or 1992, Dr. Young first had the idea of creating the product that ultimately became Prime pH.  He began to make a 3% to 5% solution of sodium chlorite in water.  Dr. Young diluted this solution in a 10:1 ratio with vegetable

75

juices.  The Youngs were drinking fresh vegetable juice at the

time, but Dr. Young was concerned that the pH was too low, so he

experimented with ways to raise the pH.  For three to four years

through 1994 or 1995, he combined fresh juice with this solution.

During that time, the Youngs sold the chemical under the

Innerlight brand name as $ClO_2$.  11/14/06 Trial Tr. at 74-76.

214.  In its current form, Prime pH is a drop that is

mixed with water and a greens product in order to raise the pH of

the solution.  11/1/06 Trial Tr. at 83-84.

215.  Dr. Young does not claim to have a patent on the

formulation for Prime pH, and Innerlight never believed that he

had a patent.  11/13/06 Trial Tr. at 222-23; 11/14/06 Trial Tr.

at 80-81.

216.  Dr. Young began to use a company by the name of

Halox, Inc., as the supplier for Prime pH in or around 1994.

Since then, Halox has been the exclusive supplier for Prime pH,

with the exception of one batch that came from a different

manufacturer.  Innerlight placed an order for Prime pH from Halox

as recently as March of 2006.  Halox is located in Eugene,

Oregon.  11/13/06 Trial Tr. at 77-79, 134-41; 11/15/06 Trial Tr.

at 132-35; Pl. Ex. 62.

217.  At some point in 2004, Halox informed Innerlight

that it could no longer ship to California, where Creation's

Garden, the company that bottled Prime pH for Innerlight, was

located.  Creation's Garden asked Innerlight to consider another source for Prime pH.  11/13/06 Trial Tr. at 136-38; 11/15/06 Trial Tr. at 132-35.

218.  Innerlight or Creation's Garden identified Vulcan Chemicals as another potential source for Prime pH.  Creation's Garden tested the product and sent a sample to Dr. Young for his approval.  Christiansen requested that Dr. Young test the product to determine whether it met his specifications.  Dr. Young tested the product's pH and "oxidated reduction potential" and approved it.  11/13/06 Trial Tr. at 138-41; 11/15/06 Trial Tr. at 132-35; 11/14/06 Trial Tr. at 82-84; Pl. Ex. 71.

219.  Soon thereafter, Innerlight received numerous calls from consumers who had become sick as a result of consuming the Prime pH that had come from Vulcan, Lot No. 2501.  It was determined that the concentration of that lot had been 25% sodium chlorite instead of the usual 5% concentration.  Innerlight did a total recall of the product.  Dr. Young cooperated with Innerlight by signing a letter reassuring distributors and by fielding numerous calls.  11/13/06 Trial Tr. at 141-44, 166; 11/14/06 Trial Tr. at 84; Pl. Ex. 72.

220.  Prime pH accounts for about 25% of Innerlight's total sales.  11/13/06 Trial Tr. at 134-36.

221.  Innerlight does not intend to pay a commission to Halox or to any other entity for Prime pH if the Court finds that

the defendants are not entitled to keep the commissions the plaintiffs paid them for Prime pH.  11/13/06 Trial Tr. at 222-23.

### c.   New Products

222.  Innerlight claims that Dr. Young wrongfully collected commissions from it for several products that were developed after the acquisition and that Innerlight claims Dr. Young did not develop.  These products include Everyday Shampoo, Everyday Conditioner, Hair Loss Formula Shampoo, Hair Loss Formula Conditioner, Hair Loss Pack, SuperSoy Sprouts Powder, and Earth Essence Clay.  11/14/06 Trial Tr. at 20-21; Pl. Ex. 67.

223.  Innerlight claims that it paid the Youngs $268,600.50 in commissions for these products to which the Youngs were not entitled.  Pl. Ex. 67.

224.  The Court has already found that Dr. Young and Innerlight had either an oral or an implicit understanding that Innerlight would pay Dr. Young 5% of sales for these products.

### (6)   The Ordway Transaction

#### a.    The Structure and Chronology of the Transaction

225.  Bridget Ordway ("Ordway") has taken two of Dr. Young's microscopy classes.  11/13/06 Trial Tr. at 38-39; 11/15/06 Trial Tr. at 167-69.

78

226.   In April of 2006, Dr. Young sold Ordway approximately 25,805 units of pH Miracle product for a total of $393,593.  This was the largest single sale Dr. Young had made since he sold Innerlight, and the largest single sale of nutritional supplements that the pH Miracle Center had made. 11/13/06 Trial Tr. at 44-47, 54-55; Pl. Ex. 39 at 2; Pl. Exs. 41, 45, 73a.

227.   The Court makes no finding as to whether Ordway or Dr. Young initiated the transaction.  It does find, however, that the transaction was for an unusually large amount of product because one or both of Dr. Young or Ordway anticipated that the Court might soon issue an injunction against the sale of pH Miracle Professional Line products.  11/13/06 Trial Tr. at 52, 54.

228.   Dr. Young gave Ordway a discount of 50% or a little bit less.  11/13/06 Trial Tr. at 49-52.

229.   Dr. Young did not receive payment from Ordway and then pay the manufacturer of the products.  Instead, the manufacturer, Creation's Garden, received payment from Ordway or an entity representing her.  Creation's Garden then forwarded to Dr. Young his portion of the proceeds.  11/15/06 Trial Tr. at 116-17, 147-49; Pl. Ex. 42.

230.   The pH Miracle Center's sales records for November of 2005 through June of 2006 do not include any sales to

79

a Bridget Ordway or to any person or entity that Dr. Young could identify as being affiliated with or representing Ordway.  The pH Miracle Center's records do not reflect a wire transfer from Ordway.  11/13/06 Trial Tr. at 33-38, 55-57; Pl. Exs. 35-38.

231.  There was never any written confirmation or purchase order created for the transaction reflecting Ordway's name.  11/13/06 Trial Tr. at 47-49; 11/15/06 Trial Tr. at 91, 154-56, 184-85.

232.  Guglielmelli and Dr. Young spoke in the beginning of April of 2006.  Dr. Young said that a large order would be coming in.  They discussed prices and the specific products in the order.  As a result, Guglielmelli put together product lists and price sheets.  11/15/06 Trial Tr. at 117-18; 11/14/06 Trial Tr. at 145-48; Pl. Exs. 39-41.

233.  Around this same time, Ordway contacted Doxey to ask whether he would sell pH Miracle products on her behalf.  She said she had a stock of product and had some friends that she would like to have the product.  Ordway asked if Doxey would act as a go-between for her.  Ordway said she would send Doxey orders, and Doxey would fax the orders on.  11/15/06 Trial Tr. at 169-72.

234.  Doxey lives in West Jordan, Utah, and owns an LLC called BXD.  11/15/06 Trial Tr. at 159-61.

235.   Doxey moved to California in 2003 to help the Youngs organize their business.  He was an independent contractor.  He and his family lived in the Youngs' guest house for eight months.  At some point, Doxey started to process inquiries about retreats or microscopy classes.  He was paid commissions for the people he signed up.  11/15/06 Trial Tr. at 161-64.

236.   Doxey moved back to Utah in 2005 but continued to sell retreats and classes for the Youngs.  He was also involved in creating some promotional DVDs.  This work is not his main business.  11/15/06 Trial Tr. at 165-67.

237.   Doxey sold two microscopy classes to Ordway in 2004.  The two spoke often.  Ordway had many requests when she attended retreats, and Doxey took care of these requests.  11/15/06 Trial Tr. at 167-69.

238.   Doxey does not know where Ordway lives but believes it may be the United Kingdom, Ireland, or South Africa, based on her accent.  He does not know her address, her e-mail, or her phone number.  11/15/06 Trial Tr. at 187-88.

239.   Guglielmelli and Dr. Young negotiated the structure and pricing of the transaction.  Doxey was not involved in setting prices and was not familiar with the terms of the deal.  11/15/06 Trial Tr. at 152-54, 184-85.

240.   Ordway told Doxey what prices to charge.
11/15/06 Trial Tr. at 193-94.

241.   Creation's Garden produced 13 invoices with an
order date listed as 4/21/06, the "Bill to" party as Monica Olsen
Brands, and the "Ship to" party as XIO Trust.  These represent
the Ordway transaction.  Rather than shipping the product to
Ordway, Creation's Garden shipped the product to its own
warehouse in Castaic, California, where most of the product still
remained at the time of the trial.  11/15/06 Trial Tr. at 127-29,
147-49; Pl. Ex. 41c-41o.

242.  Dr. Young orally authorized Guglielmelli to honor
Doxey's orders for product in the warehouse to be shipped to a
consumer.  Doxey was the only person who was authorized to
initiate a shipment from the warehouse.  Guglielmelli and Doxey
never met in person before the trial.  11/15/06 Trial Tr. at 150-
54.

243.   Guglielmelli never spoke with or met Ordway.
11/15/06 Trial Tr. at 117.

244.   Doxey, Guglielmelli, and Dr. Young all testified
that they did not know what the XIO Trust was.  Doxey knew that
Ordway was connected to it in some way and that it was a trust.
11/13/06 Trial Tr. at 57; 11/15/06 Trial Tr. at 124, 172, 174-75.

245.   Guglielmelli's wife, Monica Olsen ("Olsen"), owns
Monica Olsen Brands.  11/15/06 Trial Tr. at 116-17.

82

246.  Monica Olsen Brands received a commission as part of the transaction.  Guglielmelli explained that Monica Olsen Brands received more than $200,000 in revenue from the transaction so that Creation's Garden would not have to pay insurance on that amount, which was not part of its net revenue. 11/15/06 Trial Tr. at 123-24.

247.  The Creation's Garden summary of invoices associated with the Ordway transaction shows an amount due to Dr. Young of $252,085.80.  Pl. Exs. 39, 41.

248.  Guglielmelli sent a wire transfer from a bank account belonging to Olsen, to a bank account belonging to Shelley Young, payable on death to Dr. Young, on May 11, 2006, in the amount of $264,355.80.[25]  11/15/06 Trial Tr. at 116-17; Pl. Ex. 42.

249.  The plaintiffs have not shown by a preponderance of the evidence that Dr. Young received any revenue other than the wire transfer mentioned above from the Ordway transaction. 11/15/06 Trial Tr. at 136.

250.  Guglielmelli testified that Ordway sent a wire transfer to Olsen, but there was no documentary evidence of such a transfer.  11/15/06 Trial Tr. at 147-49.

---

[25]    The defendants' Post Trial Memorandum states that Creation's Garden kept $31,697 that the pH Miracle Center owed Creation's Garden.  This statement does not include a citation to the record and so the Court will not include this figure in its calculations.  Def. Post Tr. Br. at 14; Pl. Exs. 39, 42.

251.   The transaction took an unusual and suspicious form.  The Court continues to find the transaction unclear. Although the defendants' version of the events is not entirely credible, the Court cannot find on this record that Dr. Young continued to profit from the transaction after receiving payment from Guglielmelli.  It also cannot find by a preponderance of the evidence that Dr. Young possesses or has control over the product in Creation's Garden's warehouse.

252.   The Court finds that Dr. Young sometimes referred people interested in products to Ordway, knowing that she would provide them with pH Miracle products.  11/13/06 Trial Tr. at 102-18.

253.   Dr. Young testified that his only involvement in the transaction occurred prior to the Court's entry of its preliminary injunction on April 20, 2006.  He cannot account for why the transaction was structured the way it was.  11/13/06 Trial Tr. at 47-49, 62-66, 68-69.

254.   The product order was large enough that new product had to be manufactured to fill the order.  That manufacture occurred after April 20, 2006.  Trial Tr. at 11/15/06 at 143-44.[26]

---

[26]   Dr. Young, in contrast, testified that the product would "not necessarily" have to have been manufactured after April 20, 2006.  The Court credits the testimony of Guglielmelli, who, as president of the manufacturer, is in a better position to know.  11/13/06 Trial Tr. at 67.

b.   <u>Sales by Doxey after the Transaction</u>

255.   When a customer called Doxey to place an order, Doxey took payments by credit card.  Doxey kept some of the money and then wired the rest to an account he believed was Ordway's. Doxey did not produce any documentation showing the Ordway was the recipient of the sales proceeds that he sent.  The funds went to a bank with two forwarding addresses.  The funds would be sent to one bank and then forwarded to another bank.  Doxey had never heard of a payment procedure like this before.  11/15/06 Trial Tr. at 190-92.

256.   Doxey made a 4% to 12% commission.  Ordway would put people in touch with Doxey, and Doxey would fax the orders to Creation's Garden.  11/15/06 Trial Tr. at 170-73.

257.   Doxey had 23 invoices for the sales he made. These units account for 3,076 units sold.  11/15/06 Trial Tr. at 186-88; Pl. Ex. 74.

258.   Among the people whose orders Doxey took were Glen Stone, Richard Adgo, and Dean Snyder.  11/15/06 Trial Tr. at 189-90.

259.   Fred Shadian is one of the biggest purchasers of the pH Miracle products that Doxey facilitated since April of 2006.  Shadian made many orders since April of 2006.  Shadian's business was promoted by the pH Miracle Center as recently as

October 5, 2006.  11/15/06 Trial Tr. at 199-202; Pl. Ex. 44 at 74.

260.  One of the people whom Ordway referred to Doxey and who placed an order was Joseph Currivan ("Currivan"). 11/15/06 Trial Tr. at 174.

261.  Currivan resides in Ireland.  He has known Quigley for more than 30 years and is friends with him.  11/13/06 Trial Tr. at 101-02.

262.  Quigley asked Currivan to attend a two-day convention in Potsdam, Germany, in November of 2005 and to report back on the situation.  Currivan is not an Innerlight distributor but went at Quigley's request.  Currivan did not know there was pending litigation at the time.  Quigley paid Currivan's expenses.  11/13/06 Trial Tr. at 102-04, 120-21.

263.  Dr. Young was the leader and a presenter at the convention, which was about microscopy.  11/13/06 Trial Tr. at 102-04.

264.  Dr. Young mentioned Innerlight products once during the convention.  11/13/06 Trial Tr. at 107.

265.  At the end of the seminar, Currivan spoke with and was photographed with Dr. Young.  Currivan did not tell Dr. Young that he was a representative of Quigley's.  Quigley's sister, a Ms. Boston, accompanied Currivan to the convention.

Neither Currivan nor Boston told Dr. Young that Boston was
Quigley's sister.  11/13/06 Trial Tr. at 104, 121; Pl. Ex. 77.

266.  Currivan asked Dr. Young at the seminar whom
Currivan could contact in Ireland about the "healthy water" that
Dr. Young was promoting.  Dr. Young gave Currivan the number for
his office in California.  When Currivan called the number, the
office gave him Ordway's name.  Currivan contacted Ordway in
November of 2005 and made plans to meet in the New Year to find
out about the healthy water and the greens product.  11/13/06
Trial Tr. at 105-06; Pl. Ex. 43.

267.  Currivan and Ordway exchanged a series of e-mails
over the following few months.  They spoke by phone once or twice
and met in Dublin on March 14, 2006, for about three hours.
Currivan gave Ordway a blood sample.  Ordway processed the sample
and gave Currivan pH Miracle Greens.  Currivan said he wanted to
get involved with Innerlight's SuperGreens, and Ordway introduced
him to what she presented as a new improved greens product with
avocado, pH Miracle Greens.  11/13/06 Trial Tr. at 106-09; Pl.
Ex. 43.

268.  In one e-mail, Currivan told Ordway he wanted to
establish a networking business selling the greens product in
South Africa.  He purchased some greens in Dublin and asked
Ordway for a price list.  11/13/06 Trial Tr. at 112-13.

269.   Ordway was about to go on a trip to the United States, so she asked Currivan to contact her there.  Ordway wrote Currivan an e-mail about where she was going to be:  "I shall be at Dr. Young's this coming week."  She provided a phone number, which is the phone number for Dr. Young's Center, and invited Currivan to call.  11/13/06 Trial Tr. at 114; 11/14/06 Trial Tr. at 160-62; Pl. Ex. 43j.

270.   Currivan called the number Ordway had provided on June 23, 2006.  It was Dr. Young's ranch.  He asked for Ordway, who took about four or five minutes to get to the phone.  She said she was busy with Dr. Young and referred Currivan to Doxey to discuss pricing.  11/13/06 Trial Tr. at 115.

271.   Currivan called Doxey at the number Ordway had provided.  Doxey said he was working on documents for South Africa and said he would send a price list, which he did.  Doxey used the e-mail address xiorequest@gmail.com.  Currivan understood these to be Dr. Young's products because his face was on their labels.  11/13/06 Trial Tr. at 115-17; Pl. Ex. 43L; 11/15/06 Trial Tr. at 182.

272.   Doxey created the xiorequest@gmail.com e-mail address because he thought that XIO was associated with Ordway and would be known to her friends who placed orders.  11/15/06 Trial Tr. at 179-82.

88

273.  Currivan ordered Activator, Greens, Biolive Sprout, and Terra Cleanse.  He ordered some of the products through an Edmund Wall.  The invoice, dated July 1, 2006, shows the sender as BXD Health, West Jordan, Utah.  Currivan paid the amount listed on the invoice.  11/13/06 Trial Tr. at 117-18; Pl. Ex. 43r.

274.  Currivan did not have a sincere interest in the greens product or in becoming a distributor.  He never used the greens products that he bought.  Quigley paid his expenses, as well as a daily rate of $200 per day for the Potsdam convention. In total, Quigley paid Currivan about $800 in connection with Currivan's activities on Quigley's behalf.  11/13/06 Trial Tr. at 124-26.

275.  Currivan kept Quigley informed of his correspondence with Doxey, Wall, and Ordway.  Currivan did not tell Doxey, Wall, and Ordway that he was reporting back to Quigley.  11/13/06 Trial Tr. at 122-26.

276.  Currivan never saw Dr. Young again after the Potsdam convention.  11/13/06 Trial Tr. at 126.

277.  Currivan does not know the specific arrangements between Ordway and Doxey, or Doxey and Dr. Young.  11/13/06 Trial Tr. at 126.

278.   Since April of 2006, Doxey and Dr. Young have spoken by phone about twice a week.  11/15/06 Trial Tr. at 196-97.

279.   Dr. Young did not inform Doxey or Guglielmelli about the preliminary injunction.  11/13/06 Trial Tr. at 72-73.

280.  During the weeks leading up to the trial, Doxey became nervous about the situation and failed to fill product orders that he received.  11/15/06 Trial Tr. at 172.

c.  <u>Damages</u>

281.  Innerlight had $647,465.00 in lost sales as a result of the Ordway transaction.  Of this, it lost $597,105.00 in sales of products other than the Earth Essence Clay.[27]  Pl. Ex. 73a, 73b; 11/14/06 Trial Tr. at 6-8, 29.

282.  Applying a 33% profit margin to $597,105.00, Innerlight lost $197,044.65 in profits on products other than the Earth Essence Clay as a result of the Ordway transaction.

---

[27]   The plaintiffs claim $699,473.50 in lost sales as a result of the Ordway transaction.  That number includes $52,008.50 in sales of Fibrada that the plaintiffs allege they lost as a result of sales of pH Miracle Core Cleanse.  The Court has already stated that the plaintiffs have not shown that Fibrada is competitive with Core Cleanse.  As a result, the Court will subtract $52,008.50 from $699,473.50, leaving $647,465.00 in lost Innerlight sales as a result of the Ordway transaction.  The plaintiffs lost $50,360.00 in sales of Earth Essence as a result of the defendants' sale of Terra Cleanse.  Subtracting this sum yields $597,105.00 in lost sales of products other than Earth Essence and Fibrada.  Pl. Ex. 73a.

283.   The Youngs received $264,335.80 from Monica Olsen Brands on May 11, 2006.  This amount is slightly different from the $252,085.80 that the Creation's Garden document states is owed to Dr. Young.  The defendants did not explain the discrepancy, so the Court will use the actual amount that they were paid, which is $264,355.80.  There is no evidence of any other costs to the defendants as a result of the Ordway transaction.

284.   Of that sum, the four disputed products account for $26,400.00 in total sales, and the Terra Cleanse accounts for $10,000.00 in total sales.  In calculating the defendants' illicit profits from the Ordway transaction, the Court will subtract a proportional amount of the costs of the four disputed products and the clay product.  The Court will assume that Dr. Young received the same proportion of those sales as he did of the entire sales.  To obtain the amount of Dr. Young's revenue that was from the four disputed products and the clay, the Court will divide Dr. Young's total revenue ($264,335.80) by the transaction total ($393,593.00) and then multiply the result by $36,400.00.  The Court then subtracts that result from Dr. Young's total revenue of $264,335.80.  This yields $239,889.68 in revenue for Dr. Young that is attributable to sales of pH Miracle products other than the four disputed products and the clay.

(7)  The Youngs' Involvement with Innerlight Activities
     Dwindles

285.  At some point, the Youngs began blocking McAnly's
e-mails, and she had to communicate with them through
Christiansen.  The Innerlight National Director in London had to
cancel Innerlight's 2006 London convention because Dr. Young's
attendance had not been confirmed.  Although Dr. Young was
apparently still accepting invitations from distributors to do
events at the time of the preliminary injunction hearing,
Innerlight was not aware of this, and the arrangements for these
events were not made through Innerlight.  P.I. Tr. at 417-19.

286.  Dr. Young attended Innerlight's United States
convention in September of 2006.  Since this suit began,
Innerlight has not requested that Dr. Young attend any events
other than the annual conventions.  Innerlight stopped asking Dr.
Young to sit in on conference calls or to perform quality
control, as he had in the past.  11/14/06 Trial Tr. at 44-45,
155-56.[28]

---

[28]     Dr. Young testified that he was asked to call or e-
mail some people, but McAnly testified that Innerlight made no
requests at all other than the convention during the suit's
pendency.  This point of disagreement is minor.  The parties
agree that the Youngs have been asked to do, and have done, very
little on Innerlight's behalf since 2005.  Given the lack of
documentary evidence substantiating Dr. Young's involvement in
other activities for Innerlight, the Court finds McAnly's
testimony more credible.  11/13/06 Trial Tr. at 86-87; 11/14/06
Trial Tr. at 44-45.

287.  During 2005 and 2006, McAnly listened in on two conference calls held by Dr. Young.  In both calls, he did not mention Innerlight products.  He recommended the alkalarian lifestyle and a green drink.  On both calls, someone asked which green drink, and Dr. Young said, contact my foundation and we will talk to you then.  11/14/06 Trial Tr. at 63-64.

288.  Innerlight did not ask Shelley Young to do any work on its behalf during 2005 and 2006.  11/14/06 Trial Tr. at 42, 44-45, 155-56; 11/15/06 Trial Tr. at 30.

289.  As of the preliminary injunction hearing in January of 2006, Dr. Young had not yet committed to attending Innerlight's 2006 convention.  As a result, Innerlight had only one room scheduled for a convention.  Distributors have told McAnly that they are unwilling to invest in further promotion of Innerlight until they know its future regarding Dr. Young's support.  Distributors have already invested in and distributed materials containing Dr. Young's website address, and there is no way to retrieve these materials.  McAnly does not believe that Innerlight could survive six months if word got out that Dr. Young was allowed to continue his actions.  Brogan also believes that the company would not survive the year, because if the distributors do not get paid, they will look to other companies. P.I. Tr. at 44, 114, 120-21, 175.

(8)   Innerlight's Use of the Youngs' Likenesses and
      Intellectual Property

290.   Innerlight does not have its own website.
Instead, individual distributors have websites that have a
required format that is provided by Innerlight.  11/14/06 Trial
Tr. at 47.

291.   Shortly before the trial, Innerlight changed the
format of its required distributor website.  The website format
before the change included photographs of both Youngs, as well as
an image of a fish bowl that had been drawn by Shelley Young.[29]
11/14/06 Trial Tr. at 46-50; Def. Ex. 118.

292.   Dr. Young had given Innerlight oral permission to
use his photo and the fish bowl image and had asked Innerlight to
add Shelley Young's photo.  On September 14, 2005 and March 27,
2006, the Youngs' attorney wrote Innerlight a letter purporting
to revoke permission to use the Youngs' likenesses and
intellectual property.  11/14/06 Trial Tr. at 47-50; Def. Exs.
84, 130B.

293.   The fish bowl is a metaphor for the Youngs' New
Biology philosophy.  Dr. Young's tag line "when the fish is sick
change the water" expresses the view that excessive acidity in

---

[29]   McAnly said she thought the new website did not have
likenesses of the Youngs, but she was not sure.  She was not sure
whether or not the new Innerlight website included the fish bowl
drawing.  11/14/06 Trial Tr. at 46-47.

the body is responsible for all illnesses.  11/14/06 Trial Tr. at 127-28, 177-79; 11/15/06 Trial Tr. at 22-23; Def. Ex. 94.

(9)  <u>The Equipment Leases</u>

294.  From the acquisition until June of 2001, the plaintiffs paid the bills for certain leases of computers and software from GE Capital Colonial Pacific Leasing.  The leases corresponded to the "Colonial leases" listed in Schedule 1.03 to the APA.  11/14/06 Trial Tr. at 26-28, 92; Pl. Exs. 63-65; Def. Exs. 119, 126.

295.  Innerlight used some or all of the equipment until June of 2001, at which time it stopped using the equipment. 11/13/06 Trial Tr. at 8-14.

296.  There are no agreements post-dating the APA in which Innerlight agreed to assume responsibility for the leases.[30]  11/13/06 Trial Tr. at 16-17.

297.  The Youngs were notified in August of 2001 that Innerlight had stopped making payments on the equipment leases. 11/14/06 Trial Tr. at 172-73; Pl. Ex. 64.

---

[30]    The defendants' testimony that they had separately agreed with Ron Howell that Innerlight would assume responsibility for the leases is parol evidence, which the Court will not consider.  11/14/06 Trial Tr. at 92-97; 11/15/06 Trial Tr. at 21-22; <u>see also</u> <u>Darius</u>, 2006 WL 1071655, at *22 n.16.

II.   Conclusions of Law

        The plaintiffs seek damages and permanent injunctive
relief for various breaches of contract and Lanham Act
violations.   The Third Amended Complaint raises certain other
claims that the plaintiffs have not pursued at trial.   The Court
will find for the plaintiffs in part and for the defendants in
part on the plaintiffs' breach of contract claims.   The Court
finds that the plaintiffs were entitled to set off damages from
the Youngs' improper resale of Innerlight products and sale of
most of the pH Miracle products.   The plaintiffs were not
entitled to set off damages from royalties paid to the Youngs for
Prime pH and the new products.   The Court finds that the
plaintiffs have established unfair competition under the Lanham
Act.   The Court finds that the defendants' sale of the confusing
products was intentional.   The Court otherwise finds for the
defendants on the plaintiffs' claims.

        The defendants bring counterclaims for declaratory
judgments that (1) Innerlight breached the parties' agreements by
improperly setting off the Youngs' royalty payments; (2) the
Youngs are entitled to terminate Innerlight's licenses to use
their intellectual property, images and new products; and (3)
Innerlight must indemnify the Youngs in Utah litigation
concerning the payment of certain equipment leases.   The Youngs
also bring a claim for (4) intentional interference with

96

prospective contractual relations based on Innerlight's attempt
to enforce the non-competition agreement.  Finally, the Youngs
allege that Innerlight improperly calculated their royalties over
the years, but they did not bring this allegation as a separate
counterclaim.  The Court will find for the plaintiffs on claims
(1), (3), and (4), and will find for the defendants in part and
for the plaintiffs in part on claim (2).  The Court will not
consider the Youngs' claims of improper royalty calculation in
its calculation of Innerlight's contractual damages.

        The parties agree that their claims and counterclaims
are governed by Pennsylvania law.


        A.   Whether Innerlight's Set-Off Breached the Parties'
             Agreements

        Innerlight claimed the right to set off three types of
contractual damages:  (1) those from Dr. Young's resale of
Innerlight products; (2) commissions that Innerlight had
previously paid Dr. Young for Prime pH; and (3) commissions that
Innerlight had previously paid Dr. Young for new products.
Findings of Fact ("FOF") ¶ 207.

        The defendants argued that these set-offs were either
illegitimate or exaggerated.  As a result, the defendants allege
that the amount of the commissions the plaintiffs withheld
exceeds the amount of the plaintiffs' actual contractual damages.
Consequently, the defendants argue, the plaintiffs have breached

the parties' agreements, and the Youngs have a right to terminate the contracts.  The Court therefore should not enforce the non-competition agreement as of the date that the set-off amount exceeded Innerlight's actual contractual damages.  FOF ¶ 42; Def. Pretrial Memo. at 4-5.

The Court finds that Innerlight was not entitled to set off items (2) and (3).  Innerlight was not justified in setting off commissions it had paid for Prime pH.  What it bought from the Youngs was the right to sell and market Prime pH for a particular consumer use.  Dr. Young did not breach any warranty concerning his ownership of the product Prime pH.  He did not claim to have invented the chemical sodium chlorite, but instead to have thought of using it in a particular way, in combination with particular other products, and with the name Prime pH.  FOF ¶¶ 213-16.

Innerlight also was not entitled to set off the commissions that it paid Dr. Young for new products that he helped to develop after the acquisition.  Innerlight admitted at trial that it had either orally agreed to pay Dr. Young 5% commissions on these products, or in some cases that the agreement was implicit.  In any case, Innerlight did pay Dr. Young, so that payment in itself constitutes acceptance of a 5% commission.  FOF ¶¶ 177, 188, 190, 202.

98

The Court finds that Innerlight was justified in invoking the contractual set-off provision for item (1). The contract provided that Dr. Young could not use the Innerlight products that he purchased to compete with Innerlight in any way. Although the record does not show that Dr. Young resold all of the Innerlight product at retail price, the Court finds that he was using the product in mostly commercial ways. For instance, he would sometimes use the product to barter for services. The product was therefore put into the marketplace, reducing the demand for Innerlight sales. About half of the people listed as clients of the Center were current or former Innerlight distributors. FOF ¶¶ 97-114.

In addition, although Innerlight did not include the defendants' sale of pH Miracle Professional Line products in its set-off, Innerlight would have been entitled to do so under the parties' agreements. FOF ¶¶ 51, 208. For purposes of determining whether or not Innerlight breached the contract by invoking the set-off provision, therefore, the Court will include Innerlight's damages from the defendants' sale of competing pH Miracle Professional Line products.

For the reasons stated in the section on damages below, the Court finds that Innerlight can recover contractual damages amounting to its own lost profits from the defendants' breach of the non-competition agreement, but not the defendants' profits.

As the damages section describes, Innerlight's lost profit damages for the resale of Innerlight products plus the sale of pH Miracle products exceeds the amount it had set off at the time of trial.  Consequently, Innerlight did not breach the parties' agreements by sending the set-off letters and withholding the Youngs' commissions.  In addition, the plaintiffs have acquired irrevocable title to the assets conveyed in the APA because they have fulfilled their contractual obligations and have made well over the minimum payment of $540,000 that the contract requires in order for title to pass to the plaintiffs.  FOF ¶¶ 34, 48, 72.

B.   The Validity of the Non-Competition Agreement

        Covenants not to compete are generally disfavored under Pennsylvania law as against public policy, but they may be enforceable when they are ancillary to an employment relationship or to a sale of a business.  Jacobson & Co. v. Int'l Env't Corp., 235 A.2d 612 (Pa. 1967).  A non-competition agreement is enforceable if it is (1) related to either a contract for the sale of goodwill or other subject property or to a contract for employment; (2) supported by adequate consideration; (3) reasonably necessary to protect a legitimate business interest; and (4) reasonably limited in both time and territory.  Piercing Pagoda, Inc. v. Hoffner, 351 A.2d 207, 210-11 (Pa. 1976); see also, e.g., Prison Health Servs., Inc. v. Umar, No. Civ. A. 02-

100

2642, 2002 WL 32254510, at *11 (E.D. Pa. July 2, 2002); <u>Westec</u>
<u>Sec. Servs., Inc. v. Westinghouse Elec. Corp.</u>, 538 F. Supp. 108,
122 (E.D. Pa. 1982); <u>John G. Bryant Co., Inc. v. Sling Testing &</u>
<u>Repair</u>, 369 A.2d 1164, 1168 (Pa. 1977).

In evaluating whether the covenant is reasonably
necessary and reasonably limited, the Court considers whether the
agreement's breadth is reasonable as to (1) geographical scope,
(2) duration, and (3) types of activities embraced; and whether
the purchaser's need for protection is outweighed by the hardship
imposed on the seller or by the public interest. <u>Westec</u>, 538 F.
Supp. at 122. The hardship imposed on the restricted party must
be reviewed in conjunction with what is reasonably necessary to
protect the interests of the employer. <u>Jacobson</u>, 235 A.2d at
620.

If the Court finds that a covenant not to compete is
unreasonable in some way, the Court has the power to reform the
agreement to make the terms reasonable and to enforce the
agreement on those terms. <u>Hess v. Gebhard & Co.</u>, 808 A.2d 912,
920 (Pa. 2002); <u>Sidco Paper Co. v. Aaron</u>, 351 A.2d 250, 254 (Pa.
1976). The parties' agreements specifically contemplate such
reformation. FOF ¶¶ 22, 52.

There is no precise mathematical formula for what makes
an agreement reasonable; rather, the Court must evaluate the
specific circumstances of the case at hand. <u>Westec</u>, 538 F. Supp.

101

at 126 (citing <u>Alexander & Alexander, Inc. v. Drayton</u>, 378 F. Supp. 824, 831 (E.D. Pa.), <u>aff'd</u> 505 F.2d 729 (3d Cir. 1974)). The party seeking to avoid enforcement of the agreement has the burden of proving that the agreement is unreasonable. <u>Bryant</u>, 369 A.2d at 1169.

The Youngs do not dispute that this covenant not to compete is ancillary to a sale of a business, nor do they allege that consideration was absent as long as the Court finds Innerlight's set-off proper, as it does. They argue that Innerlight has some legitimate interest in a non-competition agreement, but that the present agreement is unreasonable because it is unlimited in time and works too much of a hardship on the Youngs. Tr. 12/21/06 Oral Arg. at 29.

Covenants not to compete that are ancillary to the sale of a business are subjected to a less stringent standard of reasonableness than covenants not to compete that are ancillary to an employment relationship. <u>Hess</u>, 808 A.2d at 920. The purpose of enforcing non-competition agreements that are ancillary to the sale of a business is to make goodwill a saleable asset. <u>Westec</u>, 538 F. Supp. at 121. As the Pennsylvania Supreme Court has explained:

> General covenants not to compete which are
> ancillary to the sale of a business serve the
> asset known as "good will" which the
> purchaser has bought. Indeed, in many
> businesses it is the name, reputation for
> service, reliability, and the trade secrets

102

> of the seller rather than the physical assets
> which constitute the inducements for a sale.
> Were the seller free to reenter the market,
> the buyer would be left holding the
> proverbial empty poke.

Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 846 (Pa. 1957); see also Alexander & Alexander, 378 F. Supp. at 829.

The Pennsylvania Supreme Court has held that covenants not to compete that are unlimited in both space and time are not enforceable. Reading Aviation Serv., Inc. v. Bertolet, 311 A.2d 628 (Pa. 1973). An agreement that is limited in either space or time, however, is prima facie valid, and the court must inquire as to the reasonableness of its provisions. Harris Calorific Co. v. Marra, 29 A.2d 64, 67 (Pa. 1942).

The Court finds that all of the features of the agreement, except duration, are reasonably necessary to protect Innerlight's legitimate interests. The Court finds that the agreement as written effectively provides for an unlimited duration, which is not reasonably necessary to protect Innerlight. Instead, the Court will reform the contract to read that it is effective for ten years.

(1)  Geographical Scope

The parties' non-competition agreement is global in scope. FOF ¶¶ 15, 45. The record reveals ample evidence that Innerlight's business is global in scope and therefore that it is

103

reasonable to expect that any meaningful non-competition agreement would also be global in scope.  Innerlight has distributors in 26 countries and sales in 45 countries, with 20% to 36% of its revenues coming from international sales in recent years.  The Doc Broc Royalty Agreement provided Innerlight with a worldwide license.  Richard Adgo has sold products that compete with Innerlight from a website based in New Zealand.  Dr. Young and Innerlight officials attend conferences abroad regularly. Dr. Young's books have been translated into several foreign languages.  The Ordway transaction also shows that the sale of the parties' products occurs across borders.  FOF ¶¶ 64, 78, 79, 153, 261-71.

Courts applying Pennsylvania law have upheld national bans when the evidence showed that the party enforcing the agreement had a nationwide business.  Kramer v. Robec, Inc., 824 F. Supp. 508, 512 (E.D. Pa. 1992) ("Since competition in the computer market is world-wide and since [the defendant] distributes throughout the nation and overseas, the geographic extent of the covenant-the United States-is reasonable."); Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997) ("[T]he territorial scope of the covenant was comparable to the market actually serviced during the course of the [parties'] relationship.").

Here, the Court is convinced that even a
nationwide non-competition agreement would not adequately protect
Innerlight's legitimate business interest in preserving the
goodwill that it purchased from the Youngs.  As long ago as 1942,
the Pennsylvania Supreme Court acknowledged that

> [w]ith the broadening of the avenues of trade
> and the increase in facilities for
> transacting business mere extent of area has
> ceased to be a controlling factor.  What
> would be a reasonable restriction as incident
> to the sale of a wholesale business might be
> unreasonable as applied to a country
> physician selling his practice.

Harris Calorific, 29 A.2d at 66-67; see also Holland v. Brown,
156 A. 168, 169 (Pa. 1931).  The agreement, therefore, is
reasonable in geographic scope.


(2)  Duration

Under the parties' agreements, the Youngs are
prohibited from competing with Innerlight for as long as
Innerlight pays them the monthly consulting payment, subject to
the set-off provision.  The Youngs are also prohibited from
employing former Innerlight employees for twelve months after
those employees left Innerlight.  FOF ¶¶ 15, 16, 47.  The Youngs
challenge the reasonableness of the first, but not the second, of
these two restrictions.  They argue that a Pennsylvania court
would not uphold a covenant not to compete that is essentially
unlimited in duration.

105

The plaintiffs argue that the non-competition agreement is not unlimited in duration but rather is limited to the time during which Innerlight pays the Youngs the contractual monthly payment, subject to the set-off provision.  If Innerlight were to cease such payments, Innerlight agrees that the Youngs would immediately be free to compete with Innerlight.  Tr. 12/21/06 Oral Arg. at 5.

Innerlight cites <u>Wainwright's Travel Service, Inc. v. Schmolk</u>, 500 A.2d 476 (Pa. Super. Ct. 1985), as supporting its position.  In <u>Schmolk</u>, the defendant was the plaintiff's former employee who had purchased shares of the plaintiff while she was an employee.  The purchase agreement for the shares contained a restrictive covenant that prohibited the defendant from competing with the plaintiff for one year after she ceased being a shareholder.[31]  <u>Id.</u> at 477.  The Court upheld the non-competition agreement over the defendant's objection that it was unreasonable as to duration because "[a]s a shareholder in a small closely held corporation, Schmolk would have access to corporate information either through attendance at meetings or review of corporate records.  The corporation is reasonable in wanting to protect this information from its competitors."  <u>Id.</u> at 478-79.  Innerlight argues that here, like in <u>Schmolk</u>, it has a legitimate

---

[31]     The non-competition agreement covered the plaintiff's "service and trade area," which consisted of five states.  <u>Id.</u> at 477.

106

interest in preventing the Youngs from using their specialized knowledge to compete with Innerlight.

This analogy fails.  In Schmolk, the restricted party had control over when and whether to stop being a shareholder. In the present case, Innerlight may unilaterally keep paying the Youngs as consultants even as it uses hardly any of the Youngs' services.  As a result, the Youngs gain little or no new corporate information about Innerlight while they continue on as nominal consultants.  The evidence shows that the only activity the Youngs performed for Innerlight during 2006 was Dr. Young's appearance at the September 2006 convention.  The parties' agreements, in contrast, provide that the Youngs shall work for Innerlight for ten hours per month and appear at ten events per year.  FOF ¶¶ 46, 286.

The purpose of enforcing a covenant not to compete is to protect the buyer's interest in the goodwill it has purchased; it is not to allow the buyer to purchase freedom from competition.  As such, a covenant not to compete is reasonable for as long as it takes for the purchaser to establish its own customer following.  Westec, 538 F. Supp. at 125 (quoting Morgan's Home Equip., 136 A.2d at 846).

Under the circumstances, allowing Innerlight unilaterally to keep the Youngs as consultants amounts to a complete lack of restriction as to duration.  To enforce the

contract as written would be precisely to allow the plaintiffs to purchase freedom from competition.  The Court will therefore not enforce the unlimited duration of the parties' non-competition agreements.  The Court will address what would be a reasonable duration after it has discussed the other factors bearing on the agreement's overall reasonableness.

(3)  Types of Activities

The Court finds that the activities that the parties' agreement restricts are reasonable.  The Youngs are prohibited from selling or promoting any dietary or nutritional products that compete with Innerlight's dietary or nutritional products. As the record demonstrates and as discussed in the section on hardship below, the Youngs are not prevented from providing other products that promote an alkalarian lifestyle, such as devices that make water more alkaline.  Nor does the covenant not to compete prevent the Youngs from developing different products, nor from having direct contact with clients.  The Doc Broc Royalty Agreement demonstrates that the parties intended that the Youngs would be allowed to sell certain dietary or nutritional products that did not directly compete with Innerlight products. FOF ¶¶ 63-65, 91, 94-95, 166.

(4)   <u>Hardship Imposed on the Youngs</u>

The hardship the non-competition agreement imposes on the Youngs is reasonable when balanced against Innerlight's legitimate business interests.  As the Court has found, Dr. Young is able to earn a substantial living even under the strictures of the non-competition agreement.  He sells books, DVDs, equipment, and accessories.  He offers microscopy courses, retreats, and individual consultations.  For her part, Shelley Young participates in microscopy and is pursuing an art degree.  FOF ¶¶ 166, 167.

Innerlight, in contrast, has a business that consists largely of the specific products and goodwill that the Youngs sold to it in 2001.  The record reveals that Innerlight's business has been significantly damaged by the Youngs' competition.  FOF ¶¶ 149-60.


(5)   <u>The Public Interest</u>

The public has a general interest in a free, competitive marketplace.  In this prong, like in the others, the Court inquires as to the specific effect of this specific non-competition agreement.  As in <u>Westec</u>, 538 F. Supp. at 126, the record does not support a conclusion that enforcing this non-competition agreement against the Youngs will result in a monopoly on nutritional products or a dearth of nutritional

products in the marketplace.  Innerlight competes with several other nutritional supplement companies.  FOF ¶ 165.

### (6)  Overall Reasonableness

Given that all factors except duration are reasonable under the circumstances, the Court will enforce the agreement but limit it in duration.  The Court has wide discretion to tailor its reformation of the contract to the individual situation.  The Youngs were associated with the Innerlight name beginning in 1987 or 1988, when they first founded Innerlight, Inc., the company that became Innerlight International, Inc.  One of the business's biggest sellers was what became known as Prime pH.  Dr. Young began to develop and market Prime pH in 1991 or 1992.  FOF ¶¶ 2, 213.

Given this long association of the Youngs and Innerlight's name and products, the Court finds that Innerlight may reasonably enforce a non-competition agreement for ten years following the signing of the NCA, until January 2, 2011.  Cf. Westec, 538 F. Supp. at 126 (reforming a 20-year non-competition agreement to a ten-year non-competition agreement).

### C.  Breach of Contract

Having found that it will enforce the parties' non-competition agreement, the Court must determine what constitutes

competition with Innerlight's business.  The plaintiffs allege
that the defendants violated the parties' non-competition
agreement in two ways:  first, by selling pH Miracle Professional
Line products, and second, by using the marks "Innerlight,"
"Alkalarian" and "Alkalize & Energize" in conjunction with those
sales.

(1)  Breach of the CA and NCA by Selling pH Miracle
Products

The plaintiffs take a broad view of the contract,
arguing that the plaintiffs' business is selling nutritional and
dietary supplements generally, and that selling any such
supplements would constitute competition with the plaintiffs.  In
particular, they request an injunction against endorsing
(including linking to products on a website), developing,
marketing, and selling all pH Miracle Professional Line products.

In response, the defendants argue that the non-
competition agreement is much narrower.  In particular, they
argue that the agreement applies only on a product-by-product
basis and prohibits the Youngs from selling only products that
have direct equivalents among Innerlight's products.  As a
result, according to the defendants, the Youngs are free to sell
and market nutritional products that do not have a specific
Innerlight counterpart.  This latter category includes but is not

limited to Core Cleanse, CLA Boost, HCA Plus, and L-Carnitine. Def. Post Trial Br. at 6-8.

The Court rejects both views.  The Court finds that the non-competition agreement covers more products than simply those that have a strict equivalent among the plaintiffs' products.  On the other hand, not all nutritional and dietary supplements compete with Innerlight's business.  The Court finds that the non-competition agreement prohibits the defendants from endorsing, developing, marketing, and selling products that have an equivalent among Innerlight products, constitute a modification of an Innerlight product, or serve a similar function in the marketplace as an Innerlight product or products.

a.   <u>Analysis of Relevant Contractual Provisions</u>

The NCA and the CA both prohibit the defendants from profiting from, participating in, or affiliating in any way with

> a business that is competitive with the
> Business that is conducted by [Darius
> Marketing], or by any Affiliate . . . as of
> the date hereof or to be conducted by [Darius
> Marketing], or by any Affiliate, immediately
> after the date hereof with the assets
> acquired pursuant to the Acquisition
> Agreement.

FOF ¶¶ 15, 47.  The non-competition agreement therefore prohibits the Youngs from competing with the business in which the plaintiffs were engaged as of, or immediately after, the acquisition.

112

To determine precisely what activities are forbidden, the Court must analyze the contracts' definitions of the terms "Business" and "Products."  The two agreements define "Business" slightly differently, but the Court finds that these definitions refer to the same activities.  The NCA defines the term "Business" as:

> the business of developing, marketing and selling nutritional supplements and related products (the "Products" which were purchased by [Darius Marketing], are set forth on Exhibit A to the Acquisition Agreement, and are distributed for sale through independent representatives nationally and internationally . . . .

FOF ¶ 14.  The CA defines the term "Business" as:

> the business of developing, marketing and selling nutritional supplements, dietary supplements and related products (the "Products" as defined below in Section 3.3[32]); such Products are distributed for sale through independent representatives nationally and internationally . . . .

FOF ¶ 45.

In both documents, the term "Business" is defined as "the business of developing, marketing and selling nutritional supplements and related products."  In both documents, this phrase is immediately followed by an open parentheses and then "the 'Products.'"  This construction is the equivalent of saying

_____

[32]   Section 3.3 of the CA defines the term "Product" as "those nutrition, dietary supplements and related products . . . which were purchased by [Darius Marketing] from the [Youngs] and are listed on Exhibit A to the Acquisition Agreement."  FOF ¶ 49.

113

that the defendants may not compete with the business of
developing, marketing and selling the Products.[33]

In both documents, the term "Products" is defined as
those items listed on Exhibit A to the APA.  This definition is
most precise in the CA, which states that the term "Products" is
defined in § 3.3 below.  That section unambiguously defines
"Products" as those purchased pursuant to Exhibit A to the APA.
The NCA is less precise as a result of its missing parentheses
close.  In the NCA, the word "Products" is immediately followed
by the phrase "which were purchased by [Darius Marketing], are
set forth on Exhibit A to the Acquisition Agreement."  Reading
this provision together with the CA, the Court finds that the
term "Products" is defined as the items set forth on Exhibit A to
the APA.

Reading the definitions of "Business" and "Products"
together, the Court concludes that the defendants are prohibited
from developing, marketing, selling, and distributing items that

---

[33]     The Court did not have occasion to rule in the
preliminary injunction opinion on the question of which products
are included in the term "Business."  At that stage, the
defendants argued only that the term "Business" covered nothing
more than MLM.  The defendants therefore argued that the non-
competition agreements allowed the defendants to sell nutritional
and dietary supplements as long as the sales occurred outside of
MLM.  The Court rejected that view, finding that the term
"Business" encompasses everything after the phrase "the business
of" in the relevant contractual provisions.  The present
interpretation of the term "Business" expands on the
interpretation in the preliminary injunction opinion.  Darius,
2006 WL 1071655, at *22.

compete with the products that Innerlight acquired under the APA.
The defendants also may not profit from, participate in, or
affiliate in any way with an enterprise that so competes with
Innerlight's products.

The contracts do not prohibit the defendants from
engaging in or aiding enterprises that market any and all
nutritional and dietary supplements.  That might have been a
valid reading had the sentences discussed above not included a
definition of the term "Products" in the same phrase as the
definition of the term "Business."  The precise contractual
language, however, does not bear so expansive a reading of the
term "Business."

Other contractual provisions show that it is
implausible that the parties meant for the non-competition
agreement to prohibit the defendants from selling all nutritional
and dietary supplements.  The parties' agreements contemplate
that there is at least some room for the Youngs to sell
nutritional products.  Section 1.09 of the APA provides that the
Youngs may, but are not obligated to, grant Innerlight the rights
to new products that the Youngs may develop after the
acquisition.  FOF ¶ 32.  This provision implies that there may be
certain products that the Youngs are allowed to sell even under
the non-competition agreement.

Although it is not part of the agreement that transferred the business from the defendants to the plaintiffs, the Doc Broc Royalty Agreement also sheds light on whether nutritional products that do not compete with, or represent modifications of, specific Innerlight products are covered by the non-competition agreement.  The Doc Broc agreement, which was not in evidence at the preliminary injunction hearing, grants a non-exclusive and revocable license.  It therefore contemplates that the Youngs themselves may sell the Doc Broc products or may offer those products to entities other than Innerlight.  FOF ¶¶ 63-65.

On the other hand, a product need not be an exact equivalent or modification of a specific Innerlight product in order to "compete" with that product.  Even setting the non-competition provisions to the side, the APA conveys to the plaintiffs the rights to the Products, their formulations, and modifications.  FOF ¶ 27.  These provisions already prohibit the defendants from marketing and selling the Products or any items that were so similar to the Products that the items would be considered modifications of the Products, rather than new products.

The non-competition provisions would be surplusage if they did nothing more than merely restate the asset sale provisions.  Instead, the defendants are prohibited from marketing or selling products that have the same function or fill

116

the same demand in the marketplace.  Having eliminated the
extremes of interpretation that the parties propose, the Court
concludes that this reading of what competes with the plaintiffs'
Business best captures the parties' intent as expressed by the
surrounding contractual provisions.

           b.   Application of Analysis to Products

           The plaintiffs have shown by a preponderance of the
evidence that the pH Miracle products in the product comparison
table compete with the corresponding Innerlight products in the
table.  FOF ¶ 119.  These pairs of products substitute for each
other in the marketplace.  The defendants did not seriously
contend at trial that the sale of these products did not violate
the non-competition agreement.

           As described in the FOF and the preliminary injunction
opinion, the ingredients in each pair of allegedly competing
products are identical or very similar.  Darius, 2006 WL 1071655,
at *22-*23; FOF ¶¶ 120-30.  It is clear that Innerlight owns the
formulations for those products with identical ingredients.
Those products with slightly different ingredients or
formulations are modifications of or improvements to Innerlight
products that belong to Darius under the APA.  FOF ¶¶ 25, 27.
This is a separate basis upon which the Court enjoins the sale of
such products.

Aside from ingredients, there are striking similarities between the appearance of the Innerlight and pH Miracle products. Many appear in virtually identical cylindrical white canisters, or blue bottles with black droppers. FOF ¶¶ 120-30. Many of the pH Miracle product labels feature the same color as the corresponding Innerlight product labels. FOF ¶¶ 120-30.

This similarity in appearance was deliberate by Dr. Young. The Court is not persuaded by Dr. Young's testimony that the similarities between pH Miracle and Innerlight products are coincidental. FOF ¶ 119. The similar appearance and names of the pH Miracle and Innerlight products were purposeful, not coincidental, particularly given the fact that Dr. Young knew the Innerlight product names and packaging design when he developed the pH Miracle products.

One product on the comparison list, however, is nevertheless not covered by the non-competition agreement. Innerlight Earth Essence Clay was developed after the acquisition, and there was no clay product conveyed on Exhibit A. FOF ¶ 186. As a result, the non-competition agreement does not prohibit the Youngs from selling or marketing a competing clay product. The Court observes that if the plaintiffs wished for new products to be covered by the non-competition agreement, they could have entered into new written contracts spelling out the parties' obligations with respect to each new product.

118

The Youngs argue that the plaintiffs cannot enjoin Core Cleanse, CLA Boost, HCA Plus, and L-Carnitine because those products do not directly compete with specific Innerlight products.  In the preliminary injunction opinion, the Court found that these products competed with Innerlight's Business because the pH Miracle Center sold these products in combination with other pH Miracle products that have direct Innerlight counterparts.  The Court also found that the defendants were on notice that the plaintiffs believed that these products were competitive with Innerlight's Business.  Darius, 2006 WL 1071655, at *23.

At trial, the Court received further testimony about these products' function and how and when they were developed. It received no evidence that these products compete with Innerlight products.  Instead, Dr. Young's testimony that these four products are sold as weight loss products was uncontradicted.  The Court therefore cannot find that these products serve the same or a similar function in the marketplace as the products Innerlight purchased under the APA.  FOF ¶ 203. The Court finds that the non-competition agreement does not cover these four products.  The Court stresses that it is not adopting the defendants' view that the non-competition agreement prohibits only products that are equivalent on a product-by-product basis to an Innerlight product.  Instead, the test is whether the

product fulfills the same function in the marketplace as any part of the Innerlight product line that was conveyed pursuant to Exhibit A of the APA.

> (2)   Breach of the APA and PCA by Using the "Innerlight," "Alkalarian" and "Alkalize & Energize" Trademarks

The plaintiffs acquired the "Innerlight," "Alkalarian" and "Alkalize & Energize" trademarks from the defendants pursuant to the APA and the PCA.  Under the APA, the defendants granted the plaintiffs the trademarks "Innerlight" and "Alkalize & Energize" and the right to use the corporate name "Innerlight International, Inc."  The defendants relinquished all rights to use a derivative or combination of that name.  FOF ¶¶ 28-29, 31.

Under the PCA, the defendants granted the plaintiffs the "Alkalarian" mark, as well.  Also under the PCA, the plaintiffs granted the defendants certain non-exclusive rights to use "Alkalarian" and "Alkalize & Energize," subject to the terms of the parties' restrictive covenants.  FOF ¶ 56.  The plaintiffs claim that the defendants have breached their restrictive covenants by using these three trademarks to market the pH Miracle Professional Line in competition with Innerlight's product line.

The defendants argue that Innerlight wanted them to use these trademarks, that they had a license under the APA and PCA

120

to use them, and that the plaintiffs never established their validity at the hearing.

The PCA provision dealing with these marks stated that the Youngs could use them "for purposes of books, publications, and video and audio tapes, provided that the use of the Marks shall, in all cases, be subject to the terms of any restrictive covenants now or hereafter in effect between the Purchaser and Innerlight and the Youngs."  Id.  Thus, even if the Youngs had a license, this arrangement was still subject to the CA and NCA non-competition provisions.

The Youngs used these marks to some extent in conjunction with the pH Miracle Professional Line.  For example, their website contained, on the same page on which the pH Miracle Professional Line products could be viewed, the phrase, "Discover the Alkalarian Approach to Optimal Living."  FOF ¶ 132.  Any use of these marks other than in books, publications, video or audio tapes is prohibited by the PCA.  The website reference therefore constituted a breach of the PCA.  The defendants have not established that Innerlight consented to this use of the term "Alkalarian."  FOF ¶ 149.  Further, even in books, publications, video or audio tapes, the use of these terms in conjunction with competing nutritional products such as the pH Miracle Professional Line would constitute a separate breach of the APA and PCA.

121

D.   Lanham Act and Related State Law Claims

(1)   Unfair Competition

The plaintiffs make common law and Lanham Act claims of unfair competition.  The Lanham Act provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125(a)(1).

The analysis of unfair competition under both federal and common law is the same as the analysis of federal trademark infringement.  A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000); Standard Terry Mills, Inc. v. Shen Mfg. Co., 803 F.2d 778, 780 n.4 (3d Cir.

122

1986).  The Court will therefore discuss and apply only the federal standard.

The plaintiffs claim that the defendants' use of the term "Innerlight" in conjunction with the sale of confusingly similar products constitutes unfair competition.  They also claim that certain of the names of pH Miracle products are similar enough to the corresponding Innerlight product that using the names constitute unfair competition.[34]

The plaintiffs' claims under 15 U.S.C. § 1125(a) also relate to trade dress.  "Trade dress refers to the design or packaging of a product which serves to identify the product's source.  It is the total image or overall appearance of a product, and includes, but is not limited to, such features as size, shape, color or color combinations, texture, graphics, or even a particular sales technique."  McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC, 511 F.3d 350, 357 (3d Cir. 2007) (quoting Shire US Inc. v. Barr Labs., Inc., 329 F.3d 348, 353 (3d Cir. 2003); Rose Art Indus., Inc. v. Swanson, 235 F.3d 165, 171 (3d Cir. 2000)) (internal quotations omitted).

---

[34]   The plaintiffs' claims relate to the following of the plaintiffs' unregistered marks: "SuperGreens," "SuperSoy," "Silver Plus," "OptiMood," "Orthoplex," and "Trace Minerals." Pl. Add'l Br. in Supp. of Mot. for Prelim. Inj. at 14.  The alleged infringing marks are "Greens," "Soy Sprouts," "Silver Defense," "Opti Oils," "Osteoplex," and "Minerals," respectively. Id.

To sustain a claim under § 1125(a), a plaintiff must prove that (1) the trade dress is distinctive, either because it is inherently distinctive or because it has acquired distinctiveness; (2) the trade dress is nonfunctional; and (3) the defendant's use of plaintiff's trade dress is likely to cause consumer confusion.  Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd., 40 F.3d 1431, 1439 (3d Cir. 1994) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 774-75 (1992)). The parties do not dispute that Innerlight satisfies prongs (1) and (2).

There are several factors to be considered in analyzing a claim of a likelihood of confusion under the Lanham Act: (1) the similarity between the parties' trade dresses; (2) the strength of the plaintiff's trade dress; (3) the price of the goods and other factors indicating the level of care and attention customers will employ when making a purchase; (4) the length of time the defendant has used the trade dress without evidence of actual confusion; (5) the intent of the defendant in adopting the trade dress; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the parties' sales efforts have similar targets; (9) the relationship of the goods in the minds of consumers because of the similarity of functions; and (10) other facts suggesting that

124

the consuming public might expect the prior owner to manufacture
a product in the defendant's market or that he is likely to
expand into that market.  McNeil, 511 F.3d at 358; see also
Checkpoint Sys. Inc. v. Check Point Software Techs., Inc., 269
F.3d 270, 280 (3d Cir. 2001).

Initial interest confusion, where a consumer is lured
to a product by its similarity to a known mark or trade dress,
even though he realizes the true identity and origin of the
product before final purchasing, is actionable under the Lanham
Act.  Another type of confusion is point-of-sale confusion, which
occurs or remains at the time of purchase.  McNeil, 511 F.3d at
358.

"The single most important factor in determining
likelihood of confusion is trade dress similarity.  The proper
test is not side-by-side comparison but whether the trade dresses
create the same overall impression when viewed separately."  Id.
at 359 (internal quotations omitted).  This is particularly true
when the products at issue directly compete with one another.
Id. at 367.

The defendants argued at the preliminary injunction
hearing that they were allowed to use the plaintiffs' trademarks
and that their products and marks were different from those of
the plaintiffs.  They did not press this argument at trial.

125

The defendants do not contest ownership or validity, and there is evidence of actual confusion and a likelihood of confusion.  For example, customers who are directed by Innerlight distributors to the Youngs' website would logically believe that the pH Miracle products are associated with the Innerlight products that are also available there.  FOF ¶ 132.  The pH Miracle products' names are confusingly similar to the Innerlight products' names.  FOF ¶ 119.  Their packaging is also confusingly similar.  FOF ¶¶ 120-30.  The target sales audience, including Innerlight distributors, people interested in improving their health through supplements, and the general public, is the same.  FOF ¶¶ 150, 289.  The channels of trade, advertising methods, and media, specifically the Youngs' website, is the same.  FOF ¶ 132.

Finally, customers who went onto the Youngs' website to purchase Innerlight products were likely to be diverted by the direct link to the similarly named and packaged pH Miracle products.  FOF ¶ 146.  They were likely to have purchased those products after e-mail or telephone communications with pH Miracle representatives.  FOF ¶¶ 132-46.  On at least one occasion, Andrew from the pH Miracle Center, in making a sale of pH Miracle products, told a customer who inquired about Innerlight products that Innerlight products were an older line, and that the pH Miracle Professional Line was the "best" product line.  FOF ¶ 144.  The defendants' actions go beyond initial interest

confusion, because it is not clear that all customers realize the true identity and origin of the defendants' products, even when they finally purchase them.  The defendants were intentionally diverting customers away from Innerlight products and towards pH Miracle products by marketing the pH Miracle Professional Line as newer and better.

(2)  <u>Trademark Infringement</u>

The plaintiffs' Third Amended Complaint makes Lanham Act and common law claims of trademark infringement based upon the defendants' use of the "Innerlight" and "Inner Link" marks in conjunction with the pH Miracle Professional Line and a homeopathic magnetic pendant, respectively.  The plaintiffs did not press these claims at trial, however.  Their proposed findings of fact and conclusions of law did not mention trademark infringement.[35]  Accordingly, the Court will find for the defendants on these claims.  Much of the same relief, however, is available under the plaintiffs' unfair competition and breach of contract claims, on which the Court finds for the plaintiffs.

---

[35]     The plaintiffs mention the term trademark infringement in the introduction to their pre-trial memorandum, but they do not brief the issue.  They do include in their proposed remedy a permanent injunction against the defendants' use of the marks "Innerlight," "Alkalarian," "Alkalize & Energize," and related marks, but the introduction to this proposed injunction states taht the Court should enjoin the defendants based on breach of contract and unfair competition.  Pl. Pre-Trial Memo. at 1, 19.

127

E.  The Plaintiffs' Other Claims

        The plaintiffs' Third Amended Complaint alleges breach
of fiduciary duty, tortious interference with contracts, and
appropriation of trade values.  The Court denied the plaintiffs'
motion for a preliminary injunction based on these causes of
action.  The plaintiffs did not press these claims at trial or in
any of their pre- or post-trial papers.  The Court will therefore
find for the defendants on these claims.


F.  The Defendants' Counterclaims

        The Court has already found for the plaintiffs on the
defendants' first counterclaim, which seeks a declaratory
judgment that the parties' agreements are terminated because the
plaintiffs breached the agreements by not paying the Youngs'
commissions.  The Court here addresses the remaining
counterclaims.


        (1)  Intentional Interference with Prospective
             Contractual Relations

        The defendants allege that if the non-competition
agreement is void or unenforceable, then the plaintiffs may be
liable to the defendants for preventing the defendants from
forming contracts with prospective clients by trying to enforce
the non-competition agreement.  Def. Pretrial Memo. at 7-8.  The

Court has held that the agreement is valid and enforceable for ten years.  If the allegedly interfering party has a legally protected interest and asserts that interest in good faith, then it is not liable for intentional interference with prospective contractual relations.  Schulman v. J.P. Morgan Inv. Mgmt., Inc., 35 F.3d 799, 810 (3d Cir. 1994).

Even if the agreement were in some way defective, however, the Youngs have not shown that Innerlight's attempt to enforce the agreement was wrongful.  "To prevail on a claim of intentional interference with prospective contractual relations under Pennsylvania law, a plaintiff must show the following: (1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct."  Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir. 1997).

The defendant[36] must have had the specific intent to interfere with and cause harm to the plaintiff.  The plaintiff bears the burden of showing a lack of prejudice or justification. Whether or not the action is privileged is closely related to

---

[36]     Here the Court uses the terms "defendant" and "plaintiff" generically to refer to claimants and respondents in a lawsuit.  The present parties are reversed, of course, because this is a counterclaim by the Youngs.

intent.  Where both parties have legitimate interests, the court must evaluate those interests and the actions that the defendant took to promote its own interests.  If the defendant's actions were "sanctioned by the rules of the game which society has adopted," then the actions are privileged, and the claim for intentional interference fails.  Glenn v. Point Park College, 272 A.2d 895, 899 (Pa. 1971) (internal quotations omitted).  Here, where Innerlight merely enforced a non-competition agreement that it believed in good faith was valid, its actions were justified.

> (2)  The Youngs' Right to Terminate Innerlight's Right
>      to Sell the New Products and to Use the Youngs'
>      Other Intellectual Property

The Youngs claim the right to enjoin Innerlight from selling Aqua O$_2$ MSM, Aqua O$_2$ Selenium, BioGen, Stabilized Oxygen Topical Spray, Doc Broc's Chewable Greens, Doc Broc's Chewable Vitamins, Earth Essence Redmond Clay, InLighten Everyday Shampoo, InLighten Everyday Conditioner, InLighten Advanced Formula Shampoo, InLighten Advanced Formula Conditioner, InLighten BioTin Hair Tonic Spray, InLighten Advanced Formula Pack, and InLighten Skin Care Pack.  They also claim the right to enjoin Innerlight's use of certain logos, particularly the fish bowl logo, and Innerlight's use of their likenesses or images.

The Court finds that the parties' agreements do not permit the Youngs to revoke the rights to new products they gave

130

to Innerlight.  The sole exception is the Doc Broc products, for which the parties have a separate written agreement granting a revocable license to Innerlight.  The Youngs have properly terminated that agreement.  Innerlight has already voluntarily stopped selling Doc Broc Products, however.  The defendants' claim for injunctive relief is therefore moot as to Doc Broc.

> a.   Products Other Than Doc Broc

All of the products here at issue, except the Doc Broc products, are governed by § 1.09 to the APA.  That section states that the Youngs, at their sole option, may grant to Darius Marketing the right to obtain some or all of the Youngs' right, title, or interest in any new products developed by the Youngs at a mutually agreed-upon price and upon mutually acceptable terms. FOF ¶ 32.

This contractual provision does not state that any such grant is revocable by the Youngs at any time.  The general testimony that Dr. Young and Innerlight agreed orally that he would receive a 5% commission on the sales of these products does not establish that he was granting Innerlight a revocable license to those products.  The Court will not infer a right to revoke

Innerlight's right to market and sell these products.[37]   FOF ¶¶
177, 188, 190, 202.


       b.   Doc Broc

       The Doc Broc products are governed by the separate Doc
Broc Royalty Agreement.   That agreement has an initial term of
three years, which expired on October 1, 2004.   The agreement
thereafter renews for one-year terms unless one of the parties
indicates its intent to discontinue the agreement in writing 30
days before the expiration of the agreement.   The Youngs
indicated their intent to discontinue in the letter of September
14, 2005.   That date was less than 30 days before the annual
renewal date of October 1.   Even so, the Doc Broc Royalty

---

       [37]   Even if the contract did provide the Youngs with the
right to revoke Innerlight's right to market and sell new
products that the Youngs developed and gave to Innerlight, the
Court would not enter judgment for the defendants on this claim.

       In some cases (the hair tonic, Aqua $O_2$ MSM, and Aqua $O_2$
Selenium), the Court finds that Dr. Young was the sole developer
of the product but that Innerlight has already discontinued sales
of the product.   FOF ¶¶ 181-83, 193-97.   In those cases, a claim
for an injunction is moot.   In other cases (the shampoo,
conditioner, oxygen spray, and clay products), the Court finds
that the products were created jointly among Dr. Young,
Innerlight, and in some cases manufacturers.   In particular, the
Stabilized Oxygen Topical Spray was created jointly by Innerlight
and Dr. Young as a result of Dr. Young's refusal to endorse a
different product that Innerlight had wished to market.   The
Court received no evidence concerning the other products on the
list the defendant seeks to enjoin.   The Court would therefore
find for the plaintiffs on the defendants' claims as to those
products.   FOF ¶¶ 176-80, 184-87, 198-201.

Agreement terminated no later than October 1, 2006.[38]  FOF ¶¶ 63-
65, 174.

Innerlight's witnesses, however, testified that
Innerlight had abandoned the Doc Broc products for lack of sales.
This question is therefore moot.  FOF ¶ 176.


c.   Designs, Logos and Insignias

The APA conveys to Innerlight the right to use designs,
logos and insignias associated with the products conveyed and
with the name Innerlight.  This includes the right to use the
fish bowl image designed by Shelley Young and the tag line, "when
the fish is sick change the water."  The defendants may not
enjoin the plaintiffs from using these designs.  FOF ¶ 28, 292.


d.   The Youngs' Likenesses

The Youngs' likenesses are of a different character.
Their use does not fit under the category of designs, logos and
insignias associated with the products in the APA or the name
Innerlight.  The parties spent little time in their papers
discussing the legal and contractual basis for this claim, and
the cases the defendants cited were not squarely on point.

---

[38]   The agreement also gives the Youngs the right to
terminate the agreement immediately if Innerlight fails to pay
any royalties due thereunder.  The Court received no evidence to
suggest that Innerlight stopped making royalty payments on Doc
Broc before it stopped selling Doc Broc altogether.  FOF ¶ 63.

The Court finds that the Youngs did not convey the right to use their likenesses or images in the APA, except for the right to use and excerpt, upon proper attribution, the tapes, videotapes and books that were in inventory, and to use all of the sales aids listed in Exhibit A to the APA.  The Youngs' letter of September 14, 2005, was effective in revoking Innerlight's permission to use the Youngs' likenesses in any way not specifically contemplated by the APA.  The Youngs may not, however, enjoin Innerlight from using any of the sales aids or other products listed on Exhibit A or on the inventory in Schedule 1.02(b)(ii) to the APA.  FOF ¶¶ 27, 43, 290-92.


(3)   The Equipment Leases

The parties' agreements specifically exclude the equipment leases from the list of liabilities that the plaintiffs acquired from the defendants.  Parol evidence to the contrary is inadmissible.  Innerlight is not liable for the equipment leases. FOF ¶¶ 30, 294-95.


G.   Damages

(1)   Damages for Violation of the Non-Competition Agreement

Under Pennsylvania law, the party alleging a breach of contract has the burden of proving damages resulting from that breach.  Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa.

134

1988); Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999).  Damages must be established with "reasonable certainty" and may not be recovered if they are too speculative, vague or contingent.  Spang, 545 A.2d at 866.  Proof of the exact amount of loss or a precise calculation of damages, however, is not required as long as the evidence "with a fair degree of probability" establishes a basis for the assessment of damages. Id. (quoting Aiken Indus., Inc. v. Estate of Wilson, 383 A.2d 808, 812 (Pa. 1978) (plurality opinion)).  Doubts are construed against the breaching party.  ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 669 (3d Cir. 1998).

Under Pennsylvania law, damages for breach of a non-competition agreement are usually measured by the profits that the non-breaching party lost as a result of the breach.  Am. Air Filter, Inc. v. McNichol, 527 F.2d 1297, 1299 (3d Cir. 1975) (plaintiff's damages were properly measured as "the profits it would have made on sales it could reasonably expect to have secured had [the defendant] not sold in breach of the agreement"); TelAmerica Medic Inc. v. AMN Television, 2002 WL 32373712 at *17 (E.D. Pa. Sept. 26, 2002) (same); Aiken, 383 A.2d at 812 (plurality opinion) (same); Scobell, Inc. v. Schade, 688 A.2d 715, 718-19 (Pa. Super. Ct. 1997) (same).

Here, Innerlight presents evidence of its lost profits as a result of the Youngs' breach of the non-competition

agreement.  In addition, Innerlight seeks to recover the Youngs' profits from the sale of the competing products.  This second figure would be higher than the first figure, according to Innerlight, because the Youngs have a higher profit margin on product sales than Innerlight does.  This is essentially a claim for restitution damages or disgorgement.

Pennsylvania law recognizes restitution damages as one of "three distinct, yet equally important, theories of damages to remedy a breach of contract: 'expectation' damages, 'reliance' damages, and 'restitution' damages." ATACS, 155 F.3d at 669; see also Trosky v. Civil Service Comm'n, 652 A.2d 813, 817 (Pa. 1995).  Expectation damages are the "preferred basis for contract damages" and seek to give the injured party the benefit of its bargain by attempting to place the aggrieved party in as good a position as it would have been had the contract been performed. ATACS, 155 F.3d at 669.  Expectation damages are measured by "the losses caused and gains prevented by defendant's breach," less any savings or other benefits from the defendant's non-performance.  Id. (citing Am. Air Filter, 527 F.2d at 1299).

Although expectation damages are the usual and preferred remedy for breach of contract, an injured party may alternatively seek reliance and restitution damages.  Such damages are typically resorted to when "recovery based on traditional notions of expectation damages is clouded because of

136

the uncertainty in measuring the loss in value to the aggrieved contracting party." Id. Reliance damages seek to put the injured party in the position that it would have had if the contract had never been made. Such damages are usually measured by the expenditures made in performance of the contract. Restitution damages, in contrast, seek to prevent one party from being unjustly enriched and are measured by the benefit received by the party subject to restitution. Id. The purpose of restitution damages, like that of reliance damages, "is to return the plaintiff to the position it held before the parties' contract." 24 Richard A. Lord, Williston on Contracts § 64:2 (4th ed. 2006).

Under Pennsylvania law, when a party breaches a non-competition agreement, the damages are the non-breaching party's lost profits, not the breaching party's profits. Am. Air Filter, 527 F.2d at 1299-1301. In American Air Filter, the court considered a company's suit for breach of a non-competition agreement by its former salesperson.[39] In addition to seeking damages for the profits it lost from the salesperson's competition, the American Air Filter plaintiff also sought to obtain as damages any profits the salesperson's new company made

_____

[39] American Air Filter was decided under both Pennsylvania and Kentucky law. The case implicated both states' laws, and the court, finding no conflict between them, applied them both in reaching its decision. Id. at 1299 n.4.

137

from his competing sales, as well as any commissions the salesperson earned on those sales.

The American Air Filter court rejected the company's attempt to measure its damages by the competing company's profits, noting "[t]he basic failing of the plaintiff's theory is that the defendant's profits are not necessarily equivalent to the plaintiff's losses" and that to "compel the defendant to disgorge these profits could give the plaintiff a windfall and penalize the defendant, neither of which serves the purpose of contract damages." Id. at 1300.  The court likewise rejected the company's attempt to obtain the defendant salesman's commissions, finding no relationship between the salesman's earnings and the plaintiff's losses. Id. at 1301.  Instead, the court held that the proper measure of damages for breach of the non-competition agreement were "the profits [the plaintiff] would have made on sales it could reasonably expect to have secured had [the defendant] not sold in breach of the agreement." Id. at 1300.

Like the plaintiff in American Air Filter, Innerlight here is seeking to measure its damages for breach of a non-competition agreement by the breaching party's profits in addition to its own losses.  As the American Air Filter court found, however, the breaching party's profits are not an appropriate measure of damages for breach of a non-competition agreement, and there is no necessary relationship between the

138

profits the Youngs made by competing with Innerlight and the compensable losses Innerlight suffered.

The Court finds that Innerlight's lost profits total $464,323.11. This corresponds to $176,899.61 for the Youngs' resale of Innerlight products, plus $90,378.85 for the Youngs' sale of pH Miracle products prior to the Ordway transaction, plus $197,044.65 for the Ordway transaction. The plaintiffs acknowledge that the defendants are entitled to subtract the amount of the set-off from the contractual damages that the Court finds the defendants owe the plaintiffs. After subtracting the $418,957.82 in commissions that Innerlight had set off through October 15, 2006, the defendants owe the plaintiffs a net of $45,365.29 in contractual damages. FOF ¶¶ 163, 206, 212, 282; Pl. Pre-Trial Memo. at 18.

The evidence of Innerlight's lost profits as a result of general loss of goodwill is too speculative for the Court to award any additional damages on that separate basis.

(2)  Lanham Act Damages

a.   Actual and Treble Damages

The Lanham Act, in contrast to the law governing non-competition agreements, allows a plaintiff in an action based on 15 U.S.C. § 1125(a) to recover the defendant's profits, the

139

plaintiff's damages,[40] and costs.  15 U.S.C. § 1117(a).  Whether the defendants willfully infringed the plaintiffs' trade dress is a factor in the Court's determination, but it is not a prerequisite for awarding the defendant's profits.[41]  Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 173-74 (3d Cir. 2005). The Court finds that awarding the defendants' profits is appropriate here.

In Banjo Buddies, the United States Court of Appeals for the Third Circuit endorsed the multi-factor test set forth in Quick Technologies, Inc. v. Sage Group PLC, 313 F.3d 338, 349 (5th Cir. 2002), to determine whether disgorgement is appropriate.  These factors "include, but are not limited to (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off."[42]  Banjo Buddies, 399 F.3d at 175 (quoting Quick Techs.,

---

[40]    The plaintiff's damages often amount to lost profits. This provision is broad, however, and can also include other monetary losses, for instance losses attributable to a diminished reputation or goodwill in the marketplace.

[41]    This remedy is sometimes referred to as "an accounting" or as "disgorgement."

[42]    "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's."  Dastar Corp. v. Twentieth Century

313 F.3d at 349).  The remedy of disgorgement "is available if the defendant is unjustly enriched, if the plaintiff sustained damages, or if an accounting is necessary to deter infringement. These rationales are stated disjunctively; any one will do." Banjo Buddies, 399 F.3d at 178.

The Court concludes that the defendants had the intent to confuse in marketing pH Miracle products with packaging designs and color schemes similar to those of comparable Innerlight products.  Innerlight has shown that sales were diverted from Innerlight to pH Miracle.  Innerlight did not delay in bringing suit.  In some cases, the defendants attempted to palm off the pH Miracle products as Innerlight products.  The public interest in not being deceived therefore weighs in Innerlight's favor, as well.  Further, the defendants were unjustly enriched by trading off the plaintiffs' reputation in the marketplace and promotion of the defendants' connection to the plaintiffs' products.  FOF ¶¶ 70, 119, 136-45.

This leaves only the question of whether other remedies are adequate.  It is possible to calculate the plaintiffs' lost profits as a result of the defendants' violation of the Lanham Act.  Because all of the other factors favor awarding the defendants' profits, however, the Court will do so.

---

Fox Film Corp., 539 U.S. 23, 28 n.1 (2003).

Section 35(a) of the Lanham Act provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a); see also Banjo Buddies, 399 F.3d at 176.  The Court has wide discretion to fashion an equitable remedy and may increase or decrease the damages award as equity requires.  The total damage award may not exceed three times the total actual damages plus costs.[43]

When the parties' products are in direct competition and the defendants' profits are derived from sales of the same products that account for the plaintiffs' lost profits, the plaintiffs cannot recover both the defendants' profits and their own lost profits.  Century Distilling Co. v. Continental

_____

[43]   The statute provides:

In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.  The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).  Willfulness or other bad intent is required for an award of enhanced damages.  See SecuraComm Consulting Inc. v. Securacom Inc., 166 F.3d 182, 187, 190 (3d Cir. 1999).

<u>Distilling Corp.</u>, 205 F.2d 140, 149 (3d Cir. 1953).  Given the Lanham Act's dictate that recovery should constitute compensation, and not a penalty, Innerlight is entitled to the Youngs' profit, not to both the Youngs' profit and its own lost profit.  The Court has already awarded the plaintiffs' lost profits as contractual damages.  The contractual and Lanham Act claims rest on some of the same evidence but have different elements.  Nonetheless, to avoid any possible implication that the Court is providing the plaintiffs with a double recovery, the Court will exercise its equitable power to award less than treble damages.  Having found that the defendants' sale of the confusing products was intentional, the Court will award one and one-half times the actual damages.  FOF ¶ 119.

The Court finds that the defendants made $176,101.45 in profits on sales of competing pH Miracle Professional Line products before the Ordway transaction, and $239,889.68 in profits on sales of competing products in the Ordway transaction.  The defendants' total profits on sales of pH Miracle Professional Line products is $415,991.13.  One and one-half times this amount is $623,986.70.  FOF ¶¶ 171, 283-84.

The Court will not separately award damages for the product that Doxey has sold.  The parties are in agreement that this product is the same product for which Dr. Young was paid in May of 2006.  To award damages based on Doxey's subsequent sales

would therefore amount to a double recovery.  FOF ¶¶ 233, 240, 242, 255-56, 266-73.

b.   <u>Attorneys' Fees</u>

As a general rule, the prevailing party is not entitled to an award of attorneys' fees absent statutory authority. <u>Alyeska Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. 240 (1975).  Innerlight seeks attorneys' fees under Section 35 of the Lanham Act, 15 U.S.C. § 1117 (providing for an award of attorneys' fees in "exceptional cases").  The Lanham Act does not define the term "exceptional case."  "[A] district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement, before a case qualifies as 'exceptional.'" <u>Ferrero U.S.A., Inc. v. Ozak Trading, Inc.</u>, 952 F.2d 44, 47 (3d Cir. 1991).  <u>Ferrero</u> cites with approval <u>Jones Apparel Group, Inc. v. Steinman</u>, 466 F. Supp. 560, 564 (E.D. Pa. 1979), which cites the Lanham Act's legislative history for the proposition that exceptional circumstances are present when the defendant's infringement was "malicious," "fraudulent," "deliberate," or "willful." <u>Jones Apparel</u>, 466 F. Supp. at 564.  Even if the conduct was not willful, the court may award attorneys' fees if equitable considerations justify such an award.  <u>SecuraComm Consulting, Inc. v. Securacom Inc.</u>, 224 F.3d 273, 279-81 (3d Cir. 2000).

144

The Court finds that the Youngs' actions were willful and that equitable considerations justify awarding attorneys' fees.  Therefore, the Court finds that this case is an "exceptional case" within the meaning of 15 U.S.C. § 1117 and Innerlight is entitled to recover reasonable attorneys' fees. FOF ¶ 119.

H.   <u>Injunctive Relief</u>

(1)   <u>Contractual Relief</u>

As the Court has already noted, it will enjoin the defendants from violating the non-competition agreement for a period of ten years, to end on January 2, 2011.  The Court will permanently enjoin the defendants from using products, modifications of products, and intellectual property in ways that directly violate the APA.

The Court will also enjoin the plaintiffs from using the defendants' likenesses in any way not specifically provided for in the APA.  For instance, the plaintiffs may not use the defendants' likenesses on their website or on those of their distributors.

(2)   <u>Lanham Act Relief</u>

Under the Lanham Act, the Court will enjoin the defendants from selling or marketing products that are packaged

145

so as to cause a likelihood of confusion between those products and Innerlight's products.  The Court will not order the product in Creation's Garden's warehouse to be destroyed.  Under 15 U.S.C. § 1118, when a Court finds a violation of 15 U.S.C. § 1125(a), the Court may order that any offending products or labels in the defendants' possession be destroyed.  The Court has not found that the product is in the defendants' possession, as that provision requires.  FOF ¶ 251.  In addition, the Court has awarded the plaintiffs contractual damages representing their lost profits as a result of lost sales.  The Court has also awarded Lanham Act damages representing the defendants' revenue stemming from the Ordway transaction.  It is therefore unnecessary also to destroy the offending products.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DARIUS INTERNATIONAL, INC.,      :      CIVIL ACTION
et al.                           :
                                 :
          v.                     :
                                 :
ROBERT O. YOUNG, et al.          :      NO. 05-6184

ORDER

AND NOW, this 23rd day of April, 2008, following a
bench trial held before the Court on November 13, 14, and 15,
2006, and upon consideration of the parties' preliminary
injunction briefs, their pre- and post-trial memoranda, and oral
argument held on December 21, 2006, IT IS HEREBY ORDERED that,
for the reasons discussed in a Memorandum and Order of this date:

1.  On the plaintiffs' claims, judgment is entered for
the plaintiffs and against the defendants in part, and for the
defendants and against the plaintiffs in part.  Judgment is
entered for the plaintiffs and against the defendants with
respect to the plaintiffs' claims of breach of contract for the
defendants' resale of Innerlight products and use of the terms
"Innerlight," "Alkalarian," and "Alkalize & Energize."  Judgment
is entered for the plaintiffs and against the defendants on the
plaintiffs' claims for set-off against the defendants' resale of
Innerlight products.  Judgment is entered for the plaintiffs and
against the defendants on some of the plaintiffs' claims based on
the defendants' sale of pH Miracle Professional Line products.

Judgment is entered for the defendants and against the plaintiffs on the plaintiffs' claim of negligent misrepresentation and set-off for improper payment of Prime pH commissions.  In all other respects, judgment is entered for the defendants and against the plaintiffs on the plaintiffs' claims for breach of contract and set-off.

      2.   Judgment is entered for the plaintiffs and against the defendants on the plaintiffs' claim of unfair competition.

      3.   Judgment is entered for the defendants and against the plaintiffs on the plaintiffs' claims of trademark infringement, breach of fiduciary duty, tortious interference, and appropriation of trade values.

      4.   Judgment is entered for the plaintiffs and against the defendants on the plaintiffs' claim for a declaratory judgment that they have full title to the products listed in the APA.

      5.   On the defendants' counterclaims, judgment is entered for the defendants and against the plaintiffs in part and for the plaintiffs and against the defendants in part.  Judgment is entered for the defendants and against the plaintiffs on some of the defendants' claim for a declaratory judgment that the defendants are entitled to terminate the plaintiffs' use of the defendants' likenesses.  Judgment is entered for the plaintiffs and against the defendants on the defendants' claim for a

2

declaratory judgment regarding the Doc Broc products because that
claim is moot.  Judgment is entered for the plaintiffs and
against the defendants on all other counterclaims.

IT IS FURTHER ORDERED that:

6.  The defendants are enjoined until January 2, 2011,
from endorsing, developing, marketing and selling any and all
nutritional and dietary supplement products that have the same
function as, or represent a modification of, the plaintiffs'
products that were conveyed pursuant to Exhibit A to the APA,
including but not limited to the nutritional and dietary
supplement products discussed as competitive in the memorandum of
today's date.  The defendants are not enjoined from endorsing,
developing, marketing and selling any nutritional and dietary
supplement products that compete with any of the plaintiffs'
products that were not conveyed pursuant to Exhibit A of the APA.
These include, but are not limited to, Terra Cleanse.  The
defendants are not enjoined from endorsing, developing, marketing
and selling any nutritional and dietary supplement products that
do not have the same function as, or represent a modification of,
the plaintiffs' products.  These include, but are not limited to,
Core Cleanse, CLA Boost, HCA Plus, and L-Carnitine.

7.  The defendants are permanently enjoined from
marketing and selling products with packaging that is similar
enough to that of the plaintiffs' products to cause likelihood of

3

consumer confusion as to the origin of the product.  In particular but without limitation, the defendants are enjoined from marketing and selling the following products in the labels they had when they were presented to the Court:  pH Miracle Greens, pH Miracle Activator, pH Miracle Biolive Sprouts, pH Miracle Silver Defense, and pH Miracle Osteoplex I.

　　　　8.　The defendants are permanently enjoined from using the "Innerlight," "Alkalarian," "Alkalize & Energize" and related marks for any purpose other than books, publications, and video and audio tapes.  The defendants are further enjoined until January 2, 2011, from using the "Innerlight," "Alkalarian," "Alkalize & Energize" and related marks in books, publications, and video and audio tapes, if those items are used in conjunction with products that compete with the plaintiffs' products, as described in paragraph 6 above.

　　　　9.　The defendants are enjoined until January 2, 2011, from making any references or having any hypertext links to the products enjoined in paragraph 6 on any website they control, including without limitation www.phmiracleliving.com.  The defendants shall not link to any websites that sell, market, or refer to the products enjoined in paragraph 6.

　　　　10.　The defendants cannot enjoin the plaintiffs from selling or marketing the new products that were the subject of the defendants' counterclaim for a declaratory judgment.

4

11.   The plaintiffs are permanently enjoined from using the defendants' likenesses in any way other than in conjunction with products or sales aids the ownership or use of which was specifically conveyed under the APA.

12.   The plaintiffs may use the fish bowl logo designed by Shelley Young and the tag line "when the fish is sick change the water."  The plaintiffs may use the defendants' likenesses or images when such use is part of their use of any product or sales aid the ownership or use of which was specifically conveyed under the APA.

13.   The defendants are not entitled to indemnification in their Utah suit regarding the equipment leases.

14.   The defendants shall pay the plaintiffs a sum of $45,365.29 in contractual damages, plus $623,986.70 in Lanham Act damages, plus costs.

15.   The defendants shall pay the plaintiffs for reasonable attorneys' fees associated with the plaintiffs' prosecution of the Lanham Act unfair competition claim.  The plaintiffs may submit a petition for attorneys' fees on or before May 23, 2008.

16.   Pursuant to Fed. R. Civ. P. 65(d), this Order shall be binding on the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those

persons in active concert or participation with them who receive

actual notice of this Order by personal service or otherwise.


                        BY THE COURT:


                        /s/ Mary A. McLaughlin
_____MARY A. McLAUGHLIN, J.